CLYDE et al. v. RICHMOND & D. R. CO. (WYCHE, Intervener).

(Circuit Court, N. D. Georgia. June 19, 1895.)

No. 587.

1. EQUITY PROCEDURE—CONCLUSIVENESS OF MASTER'S REPORT—QUESTIONS OF FACT.

The report of a special master in respect to a question of contributory negligence, depending upon conflicting evidence, where he was directed to report his conclusions upon the questions both of law and fact, will not be disturbed, unless manifestly erroneous.

2. MASTER AND SERVANT—VICE PRINCIPAL—RAILROAD TRAIN DISPATCHER.
    The train dispatcher of a railway company in the possession of re-
    ceivers is the alter ego of the receivers, in respect to a locomotive en-
    gineer injured through his negligence in directing the running of trains.

3. SAME—COLLISION OF RAILROAD TRAINS—NEGLIGENCE OF TRAIN DISPATCHER.
    The omission of a train dispatcher to notify a station keeper of the
    coming of an extra freight train, whereby the train was allowed to fol-
    low so closely upon the heels of another extra freight that a collision oc-
    curred in a fog, on a down grade, and resulted in injuries to the engineer
    of the overtaking train, *held* to have been the proximate cause of such in-
    jury, so as to render the receivers of the road liable.

The intervener, R. C. Wyche, filed his intervention in the above-
stated equity cause, claiming damages for personal injuries received
·by him while in the service of the receivers.    The intervention was
referred to William D. Ellis, Esq., as special master, and his report
is as follows:

By virtue of an order of reference from the 'circuit court of the United.
States for the Northern district of Georgia, the above-named intervention
was referred to the undersigned, as special master, with directions to con-
sider the questions of law applicable thereto, and to hear the testimony and
report his conclusions to the court. Due notice of said reference was given,
and the case was duly and legally assigned for trial; and at the time and
place assigned the intervener appeared in person and by attorney, and the
defendants, receivers, appeared by counsel. A full and complete report of
the testimony and proceedings before the special master was made, and is
herewith sent up, approved, identified, and made a part of this report.

### Statement of the Case.

The intervener contended before the special master that the defendants
were operating the property known, as the Georgia Pacific Railway,—a line
of road extending from the city of Atlanta, in the state of Georgia, to the
city of Birmingham, in the state of Alabama, and that he was in their em-
ploy, as a locomotive engineer. He also contended that on the evening of
the 28th of January, 1893, the defendants, by their servants and agents, sent
out from Woodlawn, at or very near Birmingham, two freight trains which
were not scheduled, and which were known and designated as "First and
Second Extras"; the first extra being designated also by the number of its
locomotive, #558, and the second extra, or Wyche's train, was known by the
number of its locomotive, #594. The two trains, he contended, were started
out about the same time, and that they were to run without schedule, and
by telegraphic order, under the control of the train dispatcher. He says
that they were run without trouble or·difficulty, and that at Bremen, a sta-
tion on the road, a request was made for permission to go back to Birming-
ham, or, in the language of railroad men, he requested to be "turned" at
Bremen, and that this request was made on account of anticipated difficulty
in reaching Atlanta before 8 o'clock on the next morning, which was Sunday,
it being claimed to be unlawful to run freight trains in the state of Georgia
after the hour of 8 o'clock a. m. Mr. Wyche contended that permission to
return to Birmingham was denied, and that instructions were given to go
on to Atlanta, and that while he was waiting at Bremen an accommodation
train (a scheduled train) passed in at that point, and got between him and
the first extra, and that he never did know until after the collision had oc-
curred when the passenger train ran out ahead of the first extra. He con-
tended that at Douglasville the operator gave him the white board, or signal
to go ahead, and that he proceeded according to such signal, and that between
Douglasville and Lithia Springs, near which last point the collision occurred,
there was a heavy down grade, and that by reason of his inability to control
his train he ran into the first extra, and received painful, serious, and perma-
nent injuries. He contended that he himself was without fault, and that he

was in the discharge of his duty when injured, and he contends that the defendants were negligent in several particulars: First. That they furnished him with a locomotive on which was a defective air pump, and that the defendants' governing officials at Birmingham knew of this defect when they put the locomotive in his charge. Second. That the hand brakes were defective, and failed to hold when applied, and that the defects in the hand brakes were such as could have been discovered by the defendants by the exercise of reasonable care and diligence in the line of inspection, or, in other words, by such inspection as reasonable care and diligence required them to make. Third. That the defendants, operating said road by a superintendent, and said superintendent, being represented by a train dispatcher, were negligent in the management of these extra trains and of said passenger train, in this: that he was not notified at Douglasville that the passenger train at that point had gone forward ahead of the first extra, and that he was not held at Douglasville for the time required by the rule, to wit, twenty minutes after the first extra had departed. To all contentions on the part of the intervener, defendants replied: First. That the air pump was not defective. Second. That the hand brakes were not defective. Third. That the defendants, if said hand brakes were defective, could not be held liable, because they had made all inspections which ordinary care and diligence required them to make. Fourth. That the receivers stood in the relation to the intervener of master and servant, and that, if intervener was injured in the collision, that it was through the fault and negligence of fellow servants, and that he could not recover. Fifth. That the intervener was injured by his own negligence, and, if not, that his negligence contributed to the injury, and in either event he could not recover.

## Conclusions and Findings.

The testimony in the Wyche case, according to the report herewith transmitted, covers 253 pages of typewritten matter, and, in addition thereto, it was agreed that the testimony taken in the Cosby and Dodgen cases might be considered in evidence; and it will be seen that the testimony in the Dodgen case footed up 122 pages on close, typewritten matter, and in the Cosby case the testimony covers in like manner 180 pages,—making 555 pages of testimony to be considered in this case. The special master heard the testimony delivered by the witnesses, and has read it all over since that time, carefully, twice, and has reached a conclusion after much difficulty.

The testimony shows that two extra freight trains left Woodlawn, near Birmingham, on the evening of January 28, 1893, with instructions to proceed in the direction of Atlanta. These two trains were running without schedule, and under telegraphic control from the train dispatcher, whose office was in Birmingham. They ran at a safe distance, and there was no trouble or difficulty for a part of the journey. At Bremen there was a request on the part of Wyche's train to be "turned," or, in ordinary language, to be allowed to return to Birmingham; and this request was denied, and instructions were given to proceed to Atlanta. At Bremen the accommodation train, designated on the schedule as #55, passed Wyche's train, and thus got in between these two extras. The evidence shows that at Douglasville the first extra took the side track, and #55 passed on beyond it, and proceeded towards Atlanta. At least, the evidence fails to disclose anything further in connection with that train after it passed Douglasville, and the subsequent developments of the morning show that it had safely passed at least beyond the scene of the wreck, near Lithia Springs. The evidence shows that Wyche had no notice that the passenger train had passed the first extra at Douglasville, nor is any notice shown to him as to at what time the first extra pulled out of the siding at Douglasville and proceeded towards Lithia Springs; but the testimony preponderates in favor of the proposition that the first extra had scarcely more than left the side track at Douglasville, and proceeded on its way, before Wyche's train came up to the station. The testimony shows that the train dispatcher at Birmingham was notified of the arrival of the first extra and of #55 at Douglasville; and the evidence shows that the telegraph operator at Douglasville, who reported the arrival of the other two trains, was not notified that Wyche's train, or the second extra, was on the road at

all. That was the testimony of the operator himself. The operator (Peace) at Douglasville, on page 160 (record in Wyche's case), says that it was well understood that there was no operator on duty on Sunday morning after the passenger train passed, and he had no notice of these extra trains. He says that it is not customary to run extra trains on Sunday, and that he would not let a train pass unless some one was on duty. On page 41 (testimony in Floyd Green case) he says he reported first extra and passenger train to train dispatcher, and, according to his testimony, there was no want of opportunity for notice to him of Wyche's train. There is conflict between the testimony of Wyche and the operator as to the character of the sign given him at Douglasville. Wyche testifies that he had received the signal of safety, and to proceed, and that he was following a passenger train. The operator testified that the boards were tied down, and that such position indicated that the operator was off duty. Conductor Slaton, on page 144, says his train (the same one Wyche was pulling) had "white," or a signal to proceed. The three witnesses agree that the boards were down,—both down. Wyche and Slaton testify that such a condition was equivalent to "white," or a signal to proceed. Mr. Peace, the operator, contends that the condition simply meant, "The operator is off duty, and there is no signal."

The intervener puts his case, apparently, mainly upon the idea that the air pump failed to work, and by that reason he had no air to control his train, and that when he called for brakes there was negligence in the conductor and his crew, in not putting them on, or, if they were put on, they were defective, and did not hold. From these facts, he claims that his train got away from his control, and ran down the hill rapidly, and into the rear of the first extra, and hence the collision. The special master heard the testimony of the experts on the condition of the air brakes, and on their construction and the proper method of operating them. In addition to all this, he had a complete air brake before him, and in addition to that a train was fixed up, and he saw the particular demonstration of the operation of air brakes; and upon this demonstration, and upon the testimony of the witness Broadnax, he arrives at the conclusion on this branch of the subject without difficulty. The truth is that an engineer sets his brakes by exhausting the air from his train pipe, and, if the train pipe leaked, it would have set every brake under the air cars. If there was a leak at the locomotive, through the packing, it was a most unusual thing. The special master believes the statement of Wyche that he had the sixty or seventy pounds of air when he turned over the hill, and his conclusion is that this fact destroys the contention that it all leaked out by the time he says he attempted to apply the air, just before the collision. The special master believes from the evidence that Wyche was greatly excited by the sudden appearance of the train ahead of him, and that the severe injury to his head produced a confused recollection of the events which took place at and about the time of the collision. No one could see and hear Wyche testify, and not feel that his recollection of what occurred at the scene of the accident was confused. He was unconscious for some time after the accident, and does not know how he got off the engine.

In searching after the cause of the collision, it will be well to consider the time it occurred. According to Conductor Dodgen's watch, he passed Douglasville at 7:35 a. m., and the collision occurred at 7:47 a. m., and by that calculation the train was out from Douglasville twelve minutes. Wyche says that he passed Douglasville at 7:37 or 7:39 a. m., and that the collision occurred at 7:54:40 a. m. At least, his watch stopped at that time, and the purport of his testimony is to the effect that the jar of the collision stopped his watch. Taking the average of the time of passing Douglasville as he gives it, it would show that, if his watch and Dodgen's were together, he left Douglasville only three minutes after Dodgen, and it took him until 7:54, or sixteen minutes, to get to the scene of the collision. This would make his train average about twenty miles an hour,—not above the maximum allowed by schedule. But by Dodgen's time the collision took place at 7:47 a. m., and by Wyche's at 7:54, or seven minutes later. It will be seen that the watches of these two men must have been widely apart, or else were jarred out of time by the collision. It is more than probable that the excite-

ment of the wreck, the terrible falls which each had, and the severe injuries each had, not only disturbed the condition of their timepieces, but the accuracy of their recollections. Mr. Peace says, on page 158 of the record in the Wyche case, that the passenger passed Douglasville fifteen or sixteen minutes before Wyche came up, and that the first extra left about ten minutes after the passenger. If this be true, then Wyche's train was allowed to pass Douglasville five or six minutes after the first extra had gone forward. The testimony shows that the two extra trains were out without schedules; they were run by telegraph. Orders were to be given by the train dispatcher, the "alter ego" of the company. It shows that at Bremen a refusal to let Wyche's train return to Birmingham came by wire, and instructions were given to go on to Atlanta. Defendants claimed that these telegraphic messages, if sent, were only to be regarded when received and delivered in a particular way; but Slaton says, on page 149, that they frequently got verbal orders, and he says this in connection with the order in question, received at Bremen, to go to Atlanta. At Bremen the time of the two extras was so arranged that the passenger train got between them, and Wyche says—and he is uncontradicted in this—that he never had any notice of when the passenger train passed, or was to pass out beyond the first extra, and thus leave him to follow a freight. The train dispatcher knew where all these trains were. None of the other trains knew exactly where the others were. The train dispatcher knew that the first extra had reached Douglasville. He knew that the passenger train reached that point, and there passed the first extra. He knew that Wyche was close behind, and he failed to notify Wyche of what had happened, and he failed to notify the operator even of the existence of Wyche's train, even though he was in communication with him, and knew that Wyche would be there in a few minutes. Peace was negligent in giving Wyche the white board, if he knew he was coming. He was negligent in letting him out in five or six minutes after the first extra left, if he knew he was coming. If he did not know it, the train dispatcher was negligent in not giving him the information; and this, in the opinion of the special master, was the proximate cause of the injury.

The contention by the intervener that the hand brakes were defective, and that the defendants either knew of the defects, or by the exercise of ordinary care could have discovered them, is not established, in the opinion of the special master. The testimony of Horace Reed is not believed. His contradictions, his manner, his statement in writing, all go to show that he is not worthy of credit. The only other witness to that effect, Wylie Harris, puts his statement on the subject that the brakes were not good on the fact that the train was not checked. But, even if they were defective, the evidence does not establish the fact that the defendants knew of it, or ought to have known of it. Judge Pendleton showed that there was a more perfect way to inspect brakes than the inspection, but the testimony shows that the way the inspection was made came up to the usual way, and that it was a good way. A careful study of the whole testimony, in the opinion of the special master, does not show that Wyche's train came down that hill at the tremendous speed he imagined, but rather that he came almost immediately after Dodgen, and, without knowledge that he was following him, ran into him in the dense fog of the early morning.

There is great conflict in the testimony on the subject of the extent of the injury. One eminent physician says Mr. Wyche is injured for life, and is past the hope of recovery. Another eminent physician says he is not permanently injured, but will be completely restored by a decision in his case and an easy and not dangerous operation. Each theory is strongly supported.

The special master reports as follows: First. The intervener was in the employ of the defendants as alleged. Second. Defendants, as receivers, were operating the Georgia Pacific Railway as alleged. Third. The relation of master and servant, as at common law, existed. Fourth. The intervener was of the age and earning capacity as alleged. Fifth. He was without fault that contributed to the injury. Sixth. The intervener was severely, seriously, and to some extent permanently, injured. Seventh. The collision was not brought about by defective air brakes. Eighth. The collision was not produced by defective hand brakes. Ninth. The collision resulted from negligent handling

of the two extra trains by the train dispatcher. Tenth. The train dispatcher was the "alter ego" of the defendants. Eleventh. The intervener is entitled to recover damages. Twelfth. The damages are fixed at the sum of three thousand dollars.

Respectfully submitted.

April 4, 1895.

Attention is called to the agreement of counsel to use testimony in other cases.

Smith & Pendleton, for intervener.

Jackson & Leftwich, for defendants.

NEWMAN, District Judge (after stating the facts). It will be perceived that the matters for the determination of the special master were almost entirely questions of fact, issues of fact, and conflicting testimony. The master, who is usually diligent and careful, seems to have given unusual care and attention to the consideration of this case. His report shows most thorough consideration of all the questions involved. The trial before the master occupied many weeks, and the testimony is voluminous. It seems clear that the master was correct in finding that the controlling cause of this accident was the negligence of the train dispatcher. The only doubtful question seems to be as to whether there was a contributory negligence on the part of intervener, Wyche, in running his train. This question of contributory negligence is one, above all others, which courts leave to the determination of jurors, when a case is for jury trial, or to a master, when the case is one for the determination of that officer. The finding of the jury or master in such a case will not be disturbed, unless it is manifestly erroneous. Such is not the case here. The question, it may be conceded, was doubtful, and so the master seems to have regarded it. He seems to have hesitated long, and to have given the subject the most earnest consideration. It comes within that class of cases where the court will not interfere with the finding of a master on questions of fact.

The only legal question involved is as to the finding of the special master that the train dispatcher is the alter ego of the defendant. The correctness of this finding is too clear for discussion. He is not, either upon principle or authority, a fellow servant of the engineer, and there is no difficulty whatever in the case on that ground. Railroad Co. v. Camp, 13 C. C. A. 233, 65 Fed. 952, citing the following authorities on pages 959 and 960, 65 Fed., and page 240, 13 C. C. A.: Hankins v. Railroad Co., 142 N. Y. 416, 37 N. E. 466;. Dana v. Railroad Co., 92 N. Y. 639; Sheehan v. Railroad Co., 91 N. Y. 342; Slater v. Jewett, 85 N. Y. 62; Darrigan v. Railroad Co., 52 Conn. 285; Lewis v. Seifert, 116 Pa. St. 628, 11 Atl. 514; Hunn v. Railroad Co., 78 Mich. 513, 44 N. W. 502; Railroad Co. v. Barry, 58 Ark. 198, 23 S. W. 1097; Railroad Co. v. McLallen, 84 Ill 109; Smith v. Railway Co., 92 Mo. 359, 4 S. W. 129; Washburn v. Railroad Co., 3 Head, 638; Railway Co. v. Arispe, 5 Tex. Civ. App. 611, 23 S. W. 928, and 24 S. W. 33; McKin. Fel. Serv. § 143.

The amount found in favor of the intervener by the special master was reasonable, and the exceptions must be overruled and the report confirmed.