MISSOURI, K. & T. RY. CO. v. ELLIOTT et al.

(Circuit Court of Appeals, Eighth Circuit. April 9, 1900.)

No. 1,286.

1. APPEAL—REVIEW—DISCRETIONARY ORDERS.
An order denying an application for a continuance cannot be reviewed on a writ of error in the federal courts.

2. SAME—RULING ON CHALLENGE TO JURORS.
A finding of the competency of a juror on a challenge for cause will not be set aside by a reviewing court unless error is manifest.

3. EVIDENCE—REFUSAL OF PARTY TO PRODUCE BOOKS—COMPETENCY OF SECONDARY EVIDENCE.
In an action against a railroad company, in which it is charged with liability because of the giving by its train dispatcher of orders for the movement of trains which brought them in collision, where defendant has been notified to produce the order books, train sheets, and orders concerning the movement of such trains, which are in its possession, but out of the jurisdiction of the court, and it refuses or fails to do so, secondary evidence of their contents is admissible on behalf of plaintiff.

4. SAME—PRESUMPTIONS—FAILURE TO PRODUCE EVIDENCE.
Secondary evidence introduced by a plaintiff of the contents of books in the possession of defendant, relating to a material matter, will be presumed to be correct, where the defendant, with full opportunity after the knowledge of such evidence, fails to produce the originals.

5. SAME—COMPETENCY.
A schedule showing the wages paid by a railroad company to its trainmen, produced by a terminal agent to whom it had been officially furnished by the company, is competent evidence against the company to establish the wages earned by a fireman in its service, in an action to recover for his death.

6. APPEAL—ESTOPPEL—ERRONEOUS EXCLUSION OF EVIDENCE INDUCED BY APPELLANT.
When a plaintiff offers competent evidence to prove a material fact in issue, which is erroneously excluded by the court on objection of defendant, the defendant will not be permitted to urge on appeal, as a ground for reversal, that the plaintiff failed to prove the fact which such evidence would have established.

7. WRONGFUL DEATH—DAMAGES—EVIDENCE OF EARNINGS OF DECEASED.
In an action to recover for the death of a railroad fireman, showed to have been paid on a mileage basis. it is not essential that his individual earnings should be proved, but the jury are authorized to take notice of the fact that such employés are paid in accordance with the general schedule of wages, and of any other facts within the common knowledge of intelligent men, and, in the estimation of damages, to exercise their good sense and judgment.

8. APPEAL—HARMLESS ERROR.
The admission of incompetent evidence of a material fact is an error without prejudice, where the fact is proved by other competent evidence, or the party complaining of the error was instrumental in excluding competent evidence to prove the fact, or where the fact is one of common knowledge.

9. SAME—ADMISSION OF EVIDENCE—SUFFICIENCY OF OBJECTION.
A general objection to the admission of evidence, which states no ground therefor, raises no question which can be considered by an appellate court.

10. MASTER AND SERVANT—FELLOW SERVANTS—TRAIN DISPATCHERS AND TRAINMEN.
A railroad train dispatcher, in giving orders for the movement of trains, is not a fellow servant with the employés operating such trains, but is performing a duty of the master, and for the proper and careful performance

of which the master is responsible to its employés who are required to obey such orders.

11. WRONGFUL DEATH—ACTION FOR DAMAGES—STATUTE OF INDIAN TERRITORY.

Mansf. Dig. Ark. § 5225, which gives a right of action for wrongful death, is in force in the Indian Territory, and a right of action thereunder is not affected by the fact that the deceased was instantaneously killed.

12. APPEAL—AFFIRMANCE—STATUTORY DAMAGES.

The provision of Mansf. Dig. Ark. § 1311, adopted and in force in the Indian Territory, which requires an appellate court, upon the affirmance of a judgment for the payment of money which has been superseded, to award against the appellant 10 per cent. damages on the amount superseded, is obligatory upon the United States court of appeals for the Indian Territory.

13. FELLOW SERVANTS.

All who enter the employment of a common master to accomplish a common undertaking are prima facie fellow servants. Per Sanborn, Circuit Judge, dissenting.

14. SAME—ASSUMPTION OF THE RISK OF NEGLIGENCE OF SUPERIOR SERVANTS.

The danger from the negligence of superior servants, who are engaged in the common employment, in giving the orders and directions which their subordinates must obey, is one of the common dangers of the service, which all servants assume when they enter the common employment. Per Sanborn, Circuit Judge, dissenting.

15. SAME—SUPERIOR RANK DOES NOT AFFECT THE RELATION.

Neither the fact that one servant is superior in rank or higher in grade than others in the common employment, nor the fact that his duty is to discharge and direct their movements, while their duty is to obey his orders, will abrogate or affect their relation as fellow servants. Per Sanborn, Circuit Judge, dissenting.

16. SAME—TEST OF RELATION IS DUTY DISCHARGED.

It is the nature of the duty which a servant is performing, and not his rank or authority, that determines the question whether he is a fellow servant or a vice principal. If he is discharging one of the absolute duties of the master, the duty of selecting co-employés, the duty of constructing and maintaining the railroad and its equipment, and perhaps the duty of establishing reasonable rules for its operation, he is a vice principal. But if he is not engaged in the discharge of one of these duties, and is merely employed in the operation of a railroad properly constructed, repaired, and equipped, in a position inferior to that of the superintendent of the operating department, he is a fellow servant with all, except the superintendent, and is not a vice principal. Per Sanborn, Circuit Judge, dissenting.

17. TRAIN DISPATCHER IS FELLOW SERVANT.

A train dispatcher of one of several divisions of a great railroad system, who is engaged, under the superintendent of the system, in giving orders for the movement of trains on that division, is a fellow servant of all his co-employés who are engaged in the operating department of the railroad on that division, and the company is not liable for any injury to one of the servants under him which results from his negligence in the discharge of this duty, because he and the servants under him are the employés of a common master, engaged in the common undertaking of operating the railroad. Per Sanborn, Circuit Judge, dissenting.

Millsaps v. Railway Co., 13 South. 696, 69 Miss. 423; Railroad Co. v. Hoover, 29 Atl. 994, 79 Md. 253, 25 L. R. A. 710; Blessing v. Railway Co., 77 Mo. 410; Bailey, Pers. Inj. §§ 2061, 2190; Railroad Co. v. Baugh, 13 Sup. Ct. 914, 149 U. S. 368, 37 L. Ed. 772; Railroad Co. v. Peterson, 16 Sup. Ct. 1204, 162 U. S. 346, 40 L. Ed. 944; Railroad Co. v. Poirier, 17 Sup. Ct. 741, 167 U. S. 48, 42 L. Ed. 72; Railroad Co. v. Conroy, 20 Sup. Ct. 85, Adv. S. U. S. 85, 44 L. Ed. ——; City of Minneapolis v. Lundin, 58 Fed. 525, 7 C. C. A. 344; Balch v. Haas, 73 Fed. 974, 20 C. C. A. 151; Railway Co. v. Waters, 70 Fed. 28, 16 C. C. A. 609.

In Error to the United States Court of Appeals in the Indian Territory.

The Missouri, Kansas & Texas Railway Company owns and operates a line of railroad extending from the state of Missouri, through Kansas and the Indian Territory, into the state of Texas. The railway company had a train dispatcher at McAlester, in the Indian Territory, for the purpose of ordering and directing the movement of its trains on the division of its road between McAlester and Muskogee, in the Indian Territory. On the 11th day of June, 1892, the company, through its train dispatcher, ordered one of its freight trains to move southward over its track between McAlester and Muskogee, and at the same time ordered another freight train to move northward over the same track. These two trains were ordered to move in opposite directions over the same part of a single track at the same time, with the result that a head-end collision of the trains ensued without any fault on the part of the conductor or engineer of either train; the collision being due solely to the erroneous orders of the train dispatcher. In the wreck of the trains produced by the collision, William H. Elliott, a fireman on one of the trains, was killed. This action was brought by Lydia J. Elliott, the widow, and Georgia C. Elliott and Nannie F. Elliott, the children, of the dead fireman, against the railway company, to recover damages for his death. The act of negligence charged against the railway company was the issuing by the railway company of the conflicting orders which resulted in the collision and wreck of the trains. The answer was a general denial. There was a trial to a jury, which resulted in a verdict and judgment for the plaintiffs, whereupon the defendant appealed the case to the United States court of appeals in the Indian Territory, which court affirmed the judgment of the trial court, and thereupon the defendant removed the case by writ of error into this court.

Clifford L. Jackson, for plaintiff in error.

William T. Hutchings, Preston C. West, and Wolfe & Hare, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The protests of this court against multiplied and frivolous assignments of error seem to be of no avail. There are 103 assignments of error in this case, of which not more than 4 or 5 are of sufficient gravity to challenge or justify our attention. It was apparent from the inception of this case that, if the railway company was responsible for the results of the conflicting orders it issued for the movement of its trains, it had no defense to the merits of this action, and that the only question to be litigated was the amount of the plaintiffs' damages. It is obvious from an inspection of the record that the defendant realized this fact, and, to compensate for the lack of merits, resorted to the tactics and methods not unusual in such cases, but which it pursued with more zeal and pertinacity and carried to greater heights than common.

On the 27th day of November, 1897, the defendant filed an application for a continuance of the cause, which was overruled, and this ruling of the court is one of the principal errors assigned and insisted on. Nearly a century ago the supreme court of the United States said, "It may be very hard not to grant a new trial or not to continue a cause, but in neither case can the party be relieved by a

writ of error." Insurance Co. v. Hodgson, 6 Cranch, 206, 218, 3 L. Ed. 200. And this rule has been firmly adhered to from the time it was first promulgated, in Woods v. Young, 4 Cranch, 237, 2 L. Ed. 607, to the present day, and is obligatory upon all the appellate courts of the United States. McFaul v. Ramsey, 20 How. 523, 15 L. Ed. 1010; Davis v. Patrick, 12 U. S. App. 629, 635, 6 C. C. A. 632, 57 Fed. 909; Manufacturing Co. v. Hess, 98 Fed. 56, 38 C. C. A. 647; Drexel v. True, 36 U. S. App. 611, 20 C. C. A. 265, 74 Fed. 12; Electric Co. v. Dick, 8 U. S. App. 99, 3 C. C. A. 149, 52 Fed. 379; Railway Co. v. Nelson, 2 U. S. App. 213, 1 C. C. A. 688, 50 Fed. 814. Moreover, the affidavit for a continuance made by the defendant's counsel did not comply in any respect with the requirements of the statute governing such applications, and was, from every point of view, wholly without merit. This clearly appears from the facts disclosed by the record, some of which we refer to here on account of their bearing on other assignments of error to be hereafter considered.

The collision which resulted in the death of the fireman, Elliott, occurred on the 11th day of June, 1892; this suit was begun on the 9th day of March, 1893; the answer was filed October 9, 1893; the defendant applied for and obtained the change of venue from one judicial division to another February 1, 1894; and the affidavit for a continuance was filed November 27, 1897. Soon after the commencement of the action, the plaintiffs, upon due notice to the defendant, took the depositions of J. F. Andrews, the conductor, and O. E. Thoman, the locomotive engineer, on the train going south, and of John Smythe, the conductor on the train going north, at the time of the collision. Engineer Thoman produced, and made it part of his deposition, the manifold copy of the train dispatcher's order under and in accordance with which he and his conductor were running the south-bound train; and Conductor Smythe, having given to one of the defendant's employés, on a promise to return it, which was not done, the manifold copy of the train dispatcher's order under and in pursuance of which he and his engineer were running the north-bound train, testified to its contents. The plaintiffs also took the deposition of John Sullivan, the defendant's train dispatcher at Denison, Tex., whose division extended from Denison to Muskogee, in the Indian Territory; the train dispatcher's office at McAlester having been removed from that place to Denison after the collision. Mr. Sullivan testified that he, as chief train dispatcher for the defendant over the division mentioned, had possession of the train sheets and order book of the company kept by the train dispatcher in the train dispatcher's office in McAlester at the time of the collision, and prior to the removal of the office to Denison; and he produced a sworn and compared copy of the train dispatcher's order to Conductor Smythe, taken from the original order book in his possession. He also testified to the movements of the colliding trains, as shown by the train sheet, up to the stations on either side of the point of collision, when there was "no further news of same." All of these witnesses were in the employ of the defendant, in the same

capacity, continuously from the time of the collision down to and at the time of the trial. At the taking of these depositions the defendant appeared by counsel and cross-examined the witnesses, and the depositions were returned to the court, and from the time they were taken until the day of trial they were open to the inspection of the parties. It appears from the statements in the application for a continuance that the company took no steps to prepare for the trial of the case until about the 1st of October, 1897,—more than five years after the collision, and more than four years after suit was brought. It is averred in the affidavit that about the 1st of October, 1897, the defendant's counsel notified the claim department of the defendant company to find out and report all about the family of W. H. Elliott, to the end that it might be known whether the plaintiffs were the only proper parties entitled to sue, and the affidavit further stated "that said Mrs. Lydia J. Elliott claimed that she was still unmarried, but defendant believes, if it were given full opportunity to investigate this case, it would be able to show that she has remarried since the death of her husband, William H. Elliott, and is now well provided for, and no longer dependent upon recovering a judgment in this case," and that, if further time was given it to investigate the facts, the defendant believed it could show that W. H. Elliott was a "profligate man," and would not have expended on his minor children a "proper portion of his earnings." Another alleged ground for continuance was that the widow had consented in writing to a continuance, so far as she was concerned, on account of the death of her counsel; but it is nowhere pointed out how this action of the widow, which was brought about by the defendant's claim agent, operated to hinder or delay defendant in the preparation of its case for trial, nor is it pointed out by the specific statement of any fact wherein the defendant would have been any better prepared for trial if the widow had never consented to a continuance. The counsel for the defendant, who, in his affidavit for a continuance, declared he believed he could show, if the case was continued, that the statement of Mrs. Elliott that she was still a widow was false, and that she had remarried, seems to have changed his views of the lady; and he now appears deeply solicitous for her rights, and complains that "the trial court overruled this application for a continuance, and forced the case to trial in the absence of the widow, who was not represented either in person or by counsel;  *  *  *  and she had a right to be represented, and to have an opportunity to secure an attorney to take the place of the one who had died." The widow is not here making any such complaint, and the defendant's counsel cannot be heard to make it for her.

Referring to the conductors and locomotive engineers on the colliding trains, whose depositions the plaintiff had taken, the statement is made in the affidavit "that, if such reasonable time is given him in which to secure the attendance of such last-named witnesses, it will be able to show by said witnesses such a state of facts as will require the court to hold that the man Barton, whom it is claimed by the plaintiff was the train dispatcher, was a fellow servant of said W. H. Elliott."

The witnesses here referred to were still in the employ of the defendant, and although they resided in Denison, Tex., they were subject to the defendant's orders, and could have been summoned by telegraph and reached Muskogee, the place of trial, over defendant's road, in less than half a day, at any time. Indeed, in the face of the affidavit for a continuance on the ground of the absence of these witnesses, the defendant's attorney, on the same day the affidavit was filed, objected vehemently (the objections extending over two pages of the record) to the plaintiffs reading the deposition of one of these witnesses, on the ground that "he is a witness who is as often or oftener within the jurisdiction of this court than he is out of it, and he is running on the line of the Missouri, Kansas & Texas Railway, between Denison, Texas, and Muskogee, Indian Territory, and could be reached at any time with an ordinary subpœna of this court"; and the same contention was made with reference to the two other witnesses. No one reading the affidavit for a continuance can escape the conclusion that whatever diligence was displayed by the defendant was not to prepare for the trial of the case, but to manufacture extremely flimsy and groundless pretexts for its continuance.

It is assigned for error that the court overruled the defendant's challenge for cause to three jurors. There are several sufficient answers to this assignment. It does not appear that these jurors stood in any relation to the parties that disqualified them from serving as jurors in the case, or that they had any actual bias or prejudice for or against either party to the suit; and they declared on oath that they could try the case impartially, and the court so found. "The finding of the trial court upon that issue ought not to be set aside by a reviewing court unless the error is manifest. No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence." Reynolds v. U. S., 98 U. S. 145, 156, 25 L. Ed. 244. For some reason not disclosed by the record before us, the names of two of the jurors challenged for cause do not appear in the panel of jurors that tried the case, and, as they "did not sit on the jury, no harm was done to defendant." Burt v. Panjaud, 99 U. S. 180, 25 L. Ed. 451. And, while the name of the third juror does appear in the panel, it nowhere appears in the record that the defendant exercised a single one of its peremptory challenges, so that, upon the face of the record, the defendant could have removed the juror from the panel if it desired to do so. But, as there was no valid ground of objection to the juror, it is immaterial whether the defendant had or had not exercised its right of peremptory challenge.

It is said the evidence to prove the conflicting orders issued from the train dispatcher's office for the movement of these trains was incompetent and insufficient to prove that fact. We have heretofore set out the substance of the testimony on this subject. It was not only competent, but abundantly sufficient. The original order book and train sheets were in the defendant's possession, but beyond the jurisdiction of the trial court. In apt time before the trial, the plaintiffs served on the defendant the following notice:

"In the United States Court for the Indian Territory, Northern Judicial Division, Sitting at Muskogee.

"Lydia J. Elliott, et al., Plaintiff, v. Missouri, Kansas & Texas Railway Co., Defendant. No. 2,175.

"To Missouri, Kansas & Texas Railway Company, Above-Named Defendant: You are hereby notified to produce at the trial of the above-entitled cause the original train dispatcher's books, train sheets, and train orders concerning movements of all trains over the line of the Missouri, Kansas & Texas Railway between Muskogee, Ind. Ter., and South McAlester, Ind. Ter., on the 11th day of June, 1892, and particularly all train dispatcher's books, train sheets, and train orders specially· relating to trains 1st 103 and 4th 58, alleged in the complaint to have met with a collision between South Canadian and Reams on said 11th day of June, 1892.    Given this 24th day of Sept., A. D. 1897.
                                "Lydia J. Elliott,
                                        "By Hutchings & West, Attys.
"Service of the above notice accepted this 24th day of Sept., A. D. 1897.
                                        "Clifford L. Jackson, Atty. for Deft."

The defendant having these records in its possession, and being able to produce them, but refusing to do so after due notice, the plaintiffs had a right to introduce secondary evidence of their contents. 1 Greenl. Ev. § 560.   The operators at the stations where the train dispatcher's orders were delivered to the conductors and locomotive engineers of trains retain one of the manifold copies of all orders delivered, and it is highly probable the company had possession of the retained copy of the manifold orders issued to the conductors and engineers on these trains; but, whether it had these copies or not, it did have what was more important,—the original order book containing them, and the original train sheets showing the movements of the trains until they departed from the stations between which they were wrecked by the head-end collision and were heard of no more.   Moreover, if there was any doubt or uncertainty as to the absolute correctness of the evidence relating to the orders of the train dispatcher and the train sheet, the defendant had it in its power to show that fact by the production of the originals.   It had had notice for years, by the depositions on file, just what the plaintiffs' evidence on the subject would be.   It is a well-settled rule that when the evidence tends to prove a material fact which imposes a liability on a party, and he has it in his power to produce evidence which from its very nature must overthrow the case made against him, if it is not founded on fact, and he refuses to produce such evidence, the presumption arises that the evidence, if produced, would operate to his prejudice, and support the case of his adversary.   "It is certainly a maxim," said Lord Mansfield, "that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted."   Blatch v. Archer, Cowp. 63, 65.   It is said by Mr. Starkie in his work on Evidence (volume 1, page 54):

"The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice."

,..McDonough v. O'Niel, 113 Mass. 92; Kirby v. Tallmadge, 160 U. S. 379, 383, 16 Sup. Ct. 349, 40 L. Ed. 463; Railway Co. v. Ellis, 10 U. S. App. 640,·4 C. C. A. 454, 456, 54 Fed. 481.

This rule is applied in criminal cases. Com. v. Webster, 5 Cush. 295, 316; People v. McWhorter, 4 Barb. 438. A case cannot well be imagined where this rule could have a more cogent application. The conclusion is irresistible that the company's refusal to produce the train order book and train sheet, which were in its possession, was because they would have conclusively convicted it of the alleged act of negligence.

It is assigned for error that a witness was allowed to state that the deceased fireman told the witness that he earned $40 per month when he first commenced to work for the defendant company in its switch yards, and that after he got to be a fireman his wages ran from $75 to $90 per month. There are several sufficient answers to this assignment. This question is treated in the brief of the counsel for the plaintiff in error as though the compensation of a fireman on a locomotive engine was regulated by an independent personal contract between each individual fireman and the railroad company, the contents of which were unknown to any one else. But it has come to be common knowledge that the compensation, hours of labor, etc., of firemen is fixed and regulated by contract between the railway company and the officers of the labor union known as the "Brotherhood of Locomotive Firemen," who contract for and on behalf of all firemen in the service of the company. The wage schedule is uniform for all firemen in the service, and is based on the number of miles run by the engine on which the fireman is serving, and is uniform, or substantially so, on all of the railroads in the West and South. The distance between train terminals to and from which train crews run is commonly about 150 miles, except in mountainous regions, and the average compensation of the firemen under the uniform wage schedule is from $75 to $90 per month. When the service is on the largest engines, or when extra hours are served, the compensation is slightly increased. All this is common knowledge, and, as we shall see, was also proven in this case.

The plaintiffs offered in evidence the "schedule showing the rate of wages to all classes" of the company's employés. This schedule was in the possession of Mr. E. M. Morton, the freight and ticket agent of the company at Muskogee, one of the terminal points of the Choctaw Division of the company's road, who testified that it was issued by the general manager of the company, and that it was furnished all terminal agents who had charge of yards, or anything of that kind; that a terminal was a point where train crews run from and to; and that Muskogee and Denison were the terminal points of the Choctaw Division. The witness was a terminal agent, and, as such, had been officially furnished with, and had possession of, this official schedule of wages paid employés. But the defendant objected to its introduction, and the court sustained the objection. This schedule of wages was clearly competent for the purpose of showing the wages the company paid the firemen in its employ. The rule is well settled that when the plaintiff offers and is ready to produce competent evidence to prove a material fact in issue, and the court erroneously rejects it on the objection of the defendant,

the defendant will not afterwards be heard to say that the plaintiff failed to prove the fact which the rejected evidence would have established. The defendant will not be allowed to take advantage of his own wrong, or the errors of the court induced on his own motion, and compel the plaintiff to suffer the consequences. To allow him to do so would be a travesty on justice. It would encourage unfounded, groundless, and captious objections to evidence, and reward sharp practice and chicanery. The law of estoppel may be successfully invoked to prevent such results. Bigelow, Estop. (5th Ed.) 720; Thompson v. McKay, 41 Cal. 221; Jobbins v. Gray, 34 Ill. App. 208, 218, 219; Insurance Co. v. O'Connell, 34 Ill. App. 357, 362; Elliott, App. Proc. (1892) § 630; Railway Co. v. Harris, 27 U. S. App. 450, 457, 12 C. C. A. 598, 63 Fed. 800. Moreover, there was competent evidence to show about what the earnings of a fireman were on the company's road, if it was material to prove the fact. Elliott was a fireman on the Choctaw Division, of which Muskogee and Denison were the terminal points. The question was asked Mr. Morton, how far it was from Muskogee to Denison, but the question was either not answered, or, if answered, the answer is not contained in the record before us; but that is quite immaterial, as the distance between the two cities is a matter of common knowledge, of which the jury and the court could take notice. There was not a man in Muskogee, on or off the jury, who did not know the distance from that place to Denison, Tex., the terminal points on the Choctaw Division of the company's road, independent of the company's folder which shows it to be 157 miles. Insurance Co. v. Robison, 19 U. S. App. 266, 7 C. C. A. 444, 470, 58 Fed. 723. It was proven that firemen on the company's road were paid $2\frac{1}{4}$ cents per mile on the small engines, and "on the large engines a little more than that," and that they were paid at the same rate for extra runs. Allowing for the usual runs on freight trains on a division like this, and not counting any extra runs, or work on large engines, would give a fireman an average monthly compensation of $75 to $90. This is known to all railroad men, and to all men of common intelligence living in the vicinity of railroads. The case of Railway Co. v. Needham, 10 U. S. App. 339, 349, 3 C. C. A. 129, 52 Fed. 371, was an action by the heirs of one who was killed while in the service of the railway company as a fireman; and the court, speaking by Judge Sanborn, said, "He was a fireman earning $75 or $80 a month;" and it was also said, "In the measure of damages in such an action as this, the constant factor is the practical knowledge, varied experience, and sound judgment of twelve men, and to these very much must be left;" and, speaking of the assessment of damages by the jury, it was further said, "Indeed, if, after considering all of the evidence, they found difficulty in arriving at a conclusion by mathematical calculations based on any method of investment, they would be authorized to estimate the loss according to their own good sense and judgment." Assuming the witness' statement as to what the deceased fireman told him what wages he was getting as fireman was not competent, it was merely cumulative evidence of a fact abundantly proved by com-

petent evidence, and which, besides, may fairly be said to be a matter of common knowledge.

But another and conclusive answer to the objection of this assign- ment of error is that there was no sufficient objection interposed to the hearsay evidence at the time it was introduced.   After testifying that the deceased first commenced to work for the company in the switch yard, the record shows the following proceedings took place:

"Q. What wages did he get at that time?   (Which question is objected to by the counsel for the defendant, which objection is overruled by the court, to which action of the court in so overruling defendant's objection defendant, by its counsel, then and there at the time duly excepted, and still excepts.)   A. He told me he got $40 a month.   (Whereupon counsel for defendant objected to the answer to the last question, which objection is overruled by the court, to which action of the court in so overruling defendant's objection defendant, by its counsel, then and there at the time duly excepted, and still excepts.)"

It will be observed that no ground for the objection is stated. The defendant simply "objected," which, for any legal purpose, is exactly equivalent to silence.   Insurance Co. v. Miller, 19 U. S. App. 588, 8 C. C. A. 612, 614, 60 Fed. 254; Railway Co. v. Hall, 32 U. S. App. 60, 14 C. C. A. 153, 60 Fed. 868; Mining Co. v. Berberich, 36 C. C. A. 364, 94 Fed. 329.

The case of District of Columbia v. Woodbury, 136 U. S. 450, 10 Sup. Ct. 990, 34 L. Ed. 472, was an action for a personal injury, and the court said (page 461, 136 U. S., page 994, 10 Sup. Ct., and page 476, 34 L. Ed.):

"At this point of the witness' testimony in chief he was asked 'whether the book shows that this thing was received on the 29th of November.'   The ques- tion was objected to, and the objection overruled.   The witness answered, 'It was.'   To this ruling of the court as to the question and answer the defendant excepted."

The supreme court disregarded this general exception, saying (page 462, 136 U. S., page 994, 10 Sup. Ct., and page 476, 34 L. Ed.):

"In Camden v. Doremus, 3 How. 515, 530, 11 L. Ed. 705, this court declined to consider objections made to the admission of evidence which did not state the grounds upon which they were made, and did not obviously cover the competency of such evidence, nor point to some definite and specific defect in its character.   'We must,' the court said, 'consider objections of this character as vague and nugatory, and, if entitled to weight anywhere, certainly as with- out weight before an appellate court.'   To the same effect are Burton v. Driggs, 20 Wall. 125, 133, 22 L. Ed. 299; Patrick v. Graham, 132 U. S. 627, 629, 10 Sup. Ct. 194, 33 L. Ed. 460.   This rule is especially applicable in ac- tions like the present one, in which no fixed rule can be prescribed for measuring the amount of damages, and in which the result must, of necessity, depend upon the good sense and sound discretion of the jury, as controlled by the special circumstances of the case."

And while there were objections interposed to some introductory and collateral questions propounded to the witness upon the ground that they called for hearsay, there was no objection at all interposed to the question and answer now objected to, namely:

"Q. What did he get after he got to be a fireman?   A. He told me his wages run from $75 to $90 per month."

To this question and answer no objection whatever was made.   It is always allowable to interpose stringent and rigid rules to set off hypercritical and technical objections to the admission of evidence

which it is extremely improbable had the slighest influence on the verdict. In Mining Co. v. Berberich, supra, this court said:

"If every slight defect or slip which a microscopic eye can detect in a question or answer or the charge of the court is to be counted prejudicial error, litigation will become interminable over subtle refinements and quibbles which were not seen or regarded by the judge or jury at the trial, and which had no bearing whatever on the decision of the case on its merits. Such an administration of the law would be intolerable. 'But there is nothing,' said Judge [now Mr. Justice] Brown, of the supreme court of the United States, 'which tends to belittle the authority of the courts, or to impair the confidence of the public in the certainty of justice, as much as the habit of reversing cases for slight errors in admitting testimony, or trifling slips in the charge. * * * Better by far the practice of the English courts and the federal supreme court, where every intendment is made in favor of the action of the lower court, and cases are rarely reversed except for errors going to the very merits,—errors which usually obviate the necessity of a second trial.' Report Am. Bar. Ass'n 1889, p. ——. Though these remarks of the learned justice were not uttered from the bench, they express the rule upon the subject by which appellate courts should be guided, and they have our approval."

We reaffirm what was there said, and apply it to this case. The admission of incompetent evidence of a material fact is an error without prejudice, where the fact is proved by other competent evidence (Cooper v. Coates, 21 Wall. 105, 22 L. Ed. 481), or the party complaining of the error was instrumental in excluding competent evidence to prove the fact (see authorities supra), or where the fact is one of common knowledge.

It is assigned as an error that the court refused to instruct the jury that the train dispatcher was a fellow servant of the fireman. But this was not error. That the train dispatcher is not a fellow servant of the trainmen in discharging the duties of the train dispatcher for the railroad company is now as firmly settled as any rule of law can be by judicial decisions. A railroad track is of no use to its owner or the public unless cars are run upon it. The railroad is built for that purpose. It is the movement of the trains upon the track that constitutes it a railroad. That is the consummation of the whole business. Trains will not move of their own volition. They have to be set in motion and kept moving by orders from some source. The conductors and engineers on the different trains have no authority over each other. They are required to obey orders for the movement of their trains, but can give none. The company itself can alone tell when and how its trains shall be run. That is its business, and, in the last analysis, its only business. In the orderly and safe conduct of this business, it must make a printed time-table, which is but another name for orders governing and regulating the movement of its trains under normal conditions. The making of this time-table is a legal duty of the railroad company, and, no matter upon whom the company may devolve this duty, the time-table, when made, and whether well or ill made, is the work of the railroad company, and the company is responsible for its results. It is not the work of the man who put it up, no matter what relation he sustains to the company. In contemplation of law, it must necessarily emanate from the supreme head or authority of the company, without regard to the hand used to promulgate or publish it. But printed time-

tables alone are not adequate to meet all the requirements for the speedy, orderly, and safe movements of its trains; and for this reason the company is compelled to have recourse to the telegraph, through whose agency it makes special time-tables to meet the exigencies and requirements of the business, which are not, and cannot be, provided for in the printed time-table. Of these facts, as well as of the general duties of the train dispatcher, the courts take judicial notice. State v. Indiana & I. S. R. Co., 133 Ind. 77, 81, 82, 32 N. E. 817, 18 L. R. A. 502; Railway Co. v. Heck, 151 Ind. 292, 312, 50 N. E. 988; Slater v. Jewett, 85 N. Y. 61, 68. But, whether the time-table is general or special, in print or sent by telegraph, it emanates from the railroad company (from the master), and is a duty the performance of which cannot be delegated to any servant of the company, of whatever rank, without making that servant the alter ego of the company, and the company liable for his negligence in the performance of that duty. The alter ego of the company in directing the movement of its trains by telegraph is the train dispatcher, and his orders are the orders of the company, and must be obeyed by all to whom they are addressed. The authority of the company in the premises is necessarily supreme, and its order, through its train dispatcher, must be obeyed; otherwise, inextricable confusion and destruction to life and property would be the result. It is a duty which admits of no divided authority. The train dispatcher is supreme in his sphere. No one, not even the directory itself, would presume to order the movement of a train, except through the train dispatcher, who alone, through his train dispatch book and train sheet, can issue an order for the safe movement of a train over the track. The law on this subject is well and succinctly stated in the case of Darrigan v. Railroad Co., 52 Conn. 285. The court said:

"It is the duty of the railroad company to prepare a time-table and adjust the running of its trains so as to avoid collisions. It must also devise some suitable and safe method by which to run special and irregular trains, and regular trains when off their regular time. That cannot be done by general rules. Emergencies will arise which no rules can anticipate and provide for, in which the company must act, and act promptly and efficiently. In this case the scheme devised was with these trains, controlled by one who knew the position and movement of every train on the road liable to be affected by that,—a train dispatcher acting in the name and by the authority of the superintendent. Is there not a wide and manifest difference between the duty of such an agent and a locomotive engineer? The duty of the former pertains to management and direction; that of the latter to obedience. It is immaterial that these men are hired and paid by a common employer, and that their employment is designed to accomplish one common result. * * * The train dispatcher, then, in respect to the matter of moving the trains, is supreme. The whole power of the corporation, whose duty it was to move them safely, was delegated to him. He was the agent through whom the corporation attempted to perform its duty. He acted in its name, by its authority, and in its stead. The engineer was bound to obey his orders. Disobedience or deviation would have been subversive of order and discipline, destructive in its consequences, and just cause for immediate dismissal. * * * Reason, justice, and law require that the company shall be held responsible."

In Hankins v. Railroad Co., 142 N. Y. 416, 37 N. E. 466, 25 L. R. A. 396, Judge (now Mr. Justice) Peckham, speaking for the court of appeals, said:

"Nor is the holding that a train dispatcher, in the dispatch of trains, performs for the master a duty which it owes as such, a new departure in the branch of the law under discussion. While the cases cited below do not necessarily proceed upon that basis, yet it is plain that it was in all of them regarded as an indisputable proposition, so far as a train dispatcher acted in ordering the movement of trains."

In Railway Co. v. Heck, supra, the supreme court of Indiana, after an exhaustive discussion of the question and review of the authorities, say (page 314, 151 Ind., and page 995, 50 N. E.):

"The contrary is held to be the law in Mississippi and in Maryland, in a qualified form, so that we are safe in saying that the overwhelming weight of judicial opinion is that a train dispatcher, charged with the duties and clothed with the powers that the one now in question was, is not a fellow servant with trainmen in the employ of the railroad company, but is a vice principal, for whose negligence the company is liable."

An examination of the cases confirms this statement of the court. We cite the cases: Hankins v. Railway Co., 142 N. Y. 416, 37 N. E. 466, 25 L. R. A. 396; Dana v. Railway Co., 92 N. Y. 639; Sheehan v. Railway Co., 91 N. Y. 332; Slater v. Jewett, 85 N. Y. 61; Darrigan v. Railroad Co., 52 Conn. 285; Lewis v. Seifert, 116 Pa. St. 628, 11 Atl. 514; Hunn v. Railroad Co., 78 Mich. 513, 44 N. W. 502, 7 L. R. A. 500; Railroad Co. v. Barry, 58 Ark. 198, 23 S. W. 1097; Railroad Co. v. McLallen, 84 Ill. 109; Smith v. Railway Co., 92 Mo. 359, 4 S. W. 129; Washburn v. Railroad Co., 3 Head, 638; Railway Co. v. Arispe, 5 Tex. Civ. App. 611, 23 S. W. 928, 24 S. W. 33; Railway Co. v. Camp, 31 U. S. App. 213, 229, 13 C. C. A. 233, 65 Fed. 952; Clyde v. Railroad Co. (C. C.) 69 Fed. 673; Railway Co. v. Frost's Adm'x, 44 U. S. App. 606, 21 C. C. A. 186, 74 Fed. 965; Railway Co. v. Heck, 151 Ind. 293, 306–315, 50 N. E. 988; McKune v. Railroad Co., 66 Cal. 302, 5 Pac. 482; Phillips v. Railway Co., 64 Wis. 475, 25 N. W. 544; Flannegan v. Railway Co., 40 W. Va. 436, 21 S. E. 1028; Railway Co. v. De Armond, 86 Tenn. 75, 5 S. W. 600; McKinney, Fel. Serv. (1890) § 143.

The counsel for the plaintiff in error in their brief cite and rely on Robertson v. Railroad Co., 78 Ind. 77, as establishing a different doctrine; but that case was expressly overruled by the case of Railway Co. v. Heck, 151 Ind. 292, 50 N. E. 988.

It is said that, as "Elliott suffered instantaneous death in the collision in question, any right of action for damages on account of negligence on the part of the railway company died with Elliott, and did not survive to these defendants in error." This contention was put at rest by the decision of this court in Coal Co. v. Bevil, 27 U. S. App. 96, 10 C. C. A. 41, 61 Fed. 757; Broughel v. Telephone Co. (Conn.) 45 Atl. 435.

Exception is taken to the assessment of 10 per cent. damages, upon the affirmance of the judgment appealed from, by the United States court of appeals in the Indian Territory. The Arkansas statute (section 1311, Mansf. Dig.) adopted and in force in that territory, and obligatory upon the United States court of appeals, provides:

"Upon the affirmance of a judgment, order or decree for the payment of money, the collection of which, in whole or in part, has been superseded, as provided in this chapter, 10 per centum damages on the amount superseded shall be awarded against the appellant."

It will be observed that the statute is mandatory, but, if it were otherwise, and the damages had been assessed by the court, in the exercise of its discretion, for delay, we should not disturb the order on this record.  The judgment of the United States court of appeals in the Indian Territory and the judgment of the United States court for the Northern district of the Indian Territory are affirmed.

SANBORN, Circuit Judge (dissenting).  The nature and kind of service rendered and of control and direction exercised by a train dispatcher on a division of a railroad differ in no respect from the nature and kind of service rendered and of control and direction exercised by a conductor of a train between stations (Railroad Co. v. Conroy, 20 Sup. Ct. 85, Adv. S. U. S. 85, 44 L. Ed. ——); by the foreman of a gang of laborers, engaged in repairing sections of a railroad, who has power to hire and discharge the hands who compose the gang, and exclusive charge of their direction and management in all matters connected with their employment (Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 944);  of an engineer who is regarded as conductor, and has the direction and control of his engine and fireman (Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772); of a foreman who has the power to hire and discharge men under him, and to direct them when, where, and how to work in the construction of a sewer in a city street (City of Minneapolis v. Lundin, 19 U. S. App. 245, 58 Fed. 525, 7 C. C. A. 344);  of a foreman who has the power to hire and discharge the men at work under him, and to control and direct their acts in grading a street in a city (Balch v. Haas, 36 U. S. App. 393, 20 C. C. A. 151, 73 Fed. 974); and of a section foreman who directs and controls the action of the section men who work under his charge (Railway Co. v. Waters, 36 U. S. App. 31, 16 C. C. A. 609, 70 Fed. 28); and as these various superior servants are fellow servants with their subordinates, under the decisions cited, so is a train dispatcher upon a division of a great railroad, in my opinion. There is no difference in the nature of the relation of a train dispatcher of a division of a great railroad to the trainmen, whose movements he directs, and that of the relation of a conductor to the trainmen on his train; of an engineer, who is regarded as conductor, to his fireman; of a section boss to the men of his gang; or of a foreman of a force of laborers, whose action he has the power to direct and control, to the men in his charge.  In each case the subordinate servants are required to render implicit obedience to their superior.  In each case the superior servant is himself a subordinate, who works under the direction of a superintendent or general manager.  In each case the superior servant and his subordinates are "all co-workers to the same end," regardless of their rank; and in neither case does the superior servant discharge any absolute duty of the master, or have the entire management of all his business, or of a separate and distinct department of his business.  In the last analysis, the proposition that the train dispatcher is not a fellow servant of his subordinates rests upon nothing but the superior servant doctrine,—upon nothing but the fact that he has the right to give directions for the operation of the trains which are moved by his co-workers on the particular division of the railroad

upon which they all happen to be at work. The train dispatcher of a division of a great railroad is not discharging any absolute duty of the master. Those duties are to use reasonable care to employ competent servants, to exercise ordinary care to furnish and maintain a reasonably safe railroad and equipment, and perhaps to exercise ordinary care to adopt and promulgate reasonable written or printed rules for the operation of the railroad. The train dispatcher of a division discharges neither of these duties. He does not make rules for the operation of the road. He and the trainmen on his division operate the road in accordance with the rules established by others. He is not charged with the duty of selecting other servants. He does not discharge the master's duty of using ordinary care to furnish or to maintain a reasonably safe railroad and equipment. He is not engaged in his master's duty of furnishing and maintaining the railroad and equipment, but in discharging his own duty of assisting his co-workers to operate the railroad and equipment which the master furnishes and maintains upon the particular division to which he is attached. The railroad and equipment constitute the great machine which the master furnishes for his employés to operate. His duty of furnishing and maintaining a safe machine extends only to its construction, preparation, and repair. It stops at the line of operation. The duty of careful and safe operation is the duty of the servants to whom he intrusts that function. The test of liability for an accident here is the nature of the negligence that caused it. If it was negligence in the construction and repair of the great machine, it was the negligence of the master. If it was negligence in the operation of the railroad,—in the running of its trains,—it was the negligence of the servant. The fact is unquestioned in this case that the negligence which caused the accident was not in the construction, preparation, or maintenance of the railroad or equipment, but it was the negligence of a servant in the operation of that equipment. It was not, therefore, the negligence of the master in the discharge of his duty of construction, preparation, or maintenance. Railway Co. v. Needham, 27 U. S. App. 227, 232, 11 C. C. A. 56, 59, 63 Fed. 107, 110, and cases cited. The train dispatcher in this case therefore was not engaged in the discharge of any absolute duty of the master. Nor was he intrusted with the entire management and supervision of all the business of this railroad company, or with the entire management and supervision of a distinct and separate department of its business. He was nothing but one of the subordinates of the superintendent or manager of the railroad company, engaged with all his co-workers in the operating department of the company in assisting to move its trains. He was under the same obligation and duty to obey the directions of the superintendent or general manager of the operating department of this railroad that the conductors in his division were to obey his orders, and that the firemen and engineers were to obey the directions of their conductors. Thus, it may be seen that the only basis for the conclusion that this train dispatcher was not a fellow servant of the trainmen at work on the same division with him is that he was superior to them in rank, and that his service, while it was that of obedience to his superior, the superintendent or manager, was that of control and direction of

the trainmen who were moving the trains on the division he was assisting them to operate.

It is true that authorities almost without number can be cited from the decisions of the courts in support of the position that an employé who has the direction and control of those working with or under him is the alter ego of his master, and not the fellow servant of his subordinates, and that the master is liable for his negligence. This is what is termed the "superior servant doctrine," and it has been the favorite theory of many courts, and at one time received the favorable consideration of the supreme court of the United States. Railway Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787. The later decisions of that court, however, and of the federal courts that follow its rulings, have utterly repudiated this doctrine, and have firmly established the following rules of law: All who enter the employment of a common master to accomplish a common undertaking are prima facie fellow servants. Those to whom the master intrusts the entire supervision and control of all his business, or of a distinct and separate department of a large and diversified business, and those to whom the master intrusts the discharge of his absolute duties of selecting employés, of furnishing a place for them to work and materials for them to work with, and perhaps of making rules for the conduct of his business, are not, while they are discharging these specific duties, the fellow servants of the other employés of the common master. But these servants, when they are discharging other than these specific duties, and other servants at all times, are the fellow servants of all others engaged in the common undertaking for the common master. Neither the fact that one servant is superior in rank or higher in grade than others, nor the fact that the duty of one is to order and direct the movements of others, while the duty of the others is to obey the orders and directions of their superior, will abrogate or affect their relation of fellow servants, or constitute the superior a vice principal, unless he is intrusted with the entire management of all his master's business, or of a distinct and separate department of a large and diversified business. Every servant who enters the employment of the common master assumes the risk of the negligence of his co-workers in the common undertaking, whose duty it is to direct his work and to order him when, where, and how to do it, just as much as he does that of those servants whose duty it is to work by his side and to obey the orders of the superior servants. Railroad Co. v. Conroy, 20 Sup. Ct. 85, Adv. S. U. S. 85, 44 L. Ed. ——; Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 944; Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; City of Minneapolis v. Lundin, 19 U. S. App. 245, 7 C. C. A. 344, 58 Fed. 525; Balch v. Haas, 36 U. S. App. 393, 20 C. C. A. 151, 73 Fed. 974; Railway Co. v. Waters, 36 U. S. App. 31, 16 C. C. A. 609, 70 Fed. 28; Millsaps v. Railway Co., 69 Miss. 423, 13 South. 696; Railroad Co. v. Hoover, 79 Md. 253, 29 Atl. 994, 25 L. R. A. 710; Blessing v. Railway Co., 77 Mo. 410; 2 Bailey, Pers. Inj. §§ 2061, 2190; Railroad Co. v. Poirier, 167 U. S. 48, 17 Sup. Ct. 741, 42 L. Ed. 72; Oakes v. Mase, 165 U. S. 363, 17 Sup. Ct. 345, 41 L. Ed. 746; Railroad Co. v. Keegan, 160 U. S. 259,

16 Sup. Ct. 269, 40 L. Ed. 418; Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983, 38 L. Ed. 1009; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, 29 L. Ed. 755; Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322, 27 L. Ed. 1003; Farwell v. Railroad Co., 4 Metc. (Mass.) 49; Holden v. Railroad Co., 129 Mass. 268; Clifford v. Railroad Co., 141 Mass. 564, 6 N. E. 751; Sherman v. Railroad Co., 17 N. Y. 153; Besel v. Railroad Co., 70 N. Y. 173; De Forest v. Jewett, 88 N. Y. 264; Weger v. Railroad Co., 55 Pa. St. 460; Coal Co. v. Jones, 86 Pa. St. 432.

Under the above rules, which seem to me to be sustained by the foregoing authorities, and to be now firmly established by the later decisions of the supreme court, the train dispatcher in this case, whose duty it was to direct the movement of trains on one of several divisions of this railroad, was, in my opinion, a fellow servant of all his co-workers in the operating department of the plaintiff in error below its superintendent or general manager; and for that reason the railroad company was not liable for his negligence. The deceased assumed the risk of that negligence when he entered the employment of the common master for the purpose of carrying on, in conjunction with this train dispatcher, the common undertaking of operating the railroad of the plaintiff in error. The trial court refused to declare this to be the law, and the court of appeals in the Indian Territory sustained that ruling. For this reason it seems to me that the judgments below should be reversed.

The ruling to which reference has been made is not, in my opinion, the only error in the trial of this case. There were several errors,— notably, the refusal of the trial court to instruct the jury that they should not consider the testimony of Broyles, which was mere hearsay, in assessing the damages. But the fundamental error has already been discussed, and no good purpose would be subserved by prolonging this opinion to consider less important mistakes.