PHILLIPS, Administrator, etc., Respondent, vs. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

*November 3 — December 1, 1885.*

*(1) Estates of decedents: Appointment of administrator to bring action for causing death. (2-4) Railroads: Negligence: Collision: Signals: Rules construed: Court and jury: Instructions. (5) Who are fellow-servants: Employees of one company running trains on track of another.*

1. In an action by an administrator to recover damages for the death of his intestate the complaint alleged that the deceased left no property. The answer denied the appointment of the plaintiff as administrator. *Held,* that the letters of administration issued to the plaintiff were admissible in evidence, notwithstanding an objection on the ground that, there being no estate to administer, there was no authority to issue the letters.

2. Where the uncontroverted evidence showed that a railroad station at which a collision occurred was only a signal station; that there was no depot or depot grounds, but only a side-track, and no person stationed there, it was not error in an instruction to the jury, after stating those facts, to add that "the only person who could give signals at that point would be men connected with trains stopping at that point."

64 475
85 612
64 475
d110 ⁵121
54 LRA 94n
64 475
57 LRA 719

**3.** Between Milwaukee and Schwartzburg, the trains of the W. C. railroad were run over the defendant's track under the rules and running orders prescribed by the defendant. A W. C. freight train left Milwaukee under special orders from defendant's train-dispatcher to "run wild to Schwartzburg, keeping clear of regular trains." There was a dense fog, and at a signal station between those points said train ran into a train of the defendant which had left Milwaukee before it and was then more than an hour behind time, and which was backing, when the collision occurred. A brakeman of the W. C. train was killed. In an action to recover damages for such killing, *held:*

(1) An instruction to the jury that the persons in charge of the W. C. train were bound to observe the rules of the defendant so far as they did not conflict with the special orders which they had received, was not misleading to the prejudice of the defendant.

(2) A train which if on time would not have arrived at Schwartzburg until after the W. C. train had left the last telegraph station before that place, was a "regular" train, for which a lookout was to be kept.

(3) A rule that trains are always to "approach a station on the supposition that a train is to be met there and is standing upon the main track," contemplates only the *meeting* of trains.

(4) The questions of negligence in the management of the W. C. train, and of negligence on the part of those in charge of the defendant's train in failing to give any signals or warning to trains which might be following, were properly submitted to the jury.

**4.** A rule required that "conductors and brakemen of freight trains approaching stations must be out on their trains at least one mile from every station." As the W. C. train approached the station at which the collision occurred the conductor was riding upon the engine and the brakeman who was killed was standing in the gangway between the tank and the engine. It was so foggy that the engineer could not see more than fifteen feet ahead of the engine. *Held:*

(1) The negligence, if any, of the conductor and brakeman in remaining in those places, was remote and did not contribute to the accident.

(2) Although had the brakeman been at his post on top of the cars he might not have been injured, yet his improper position was not the proximate cause of the injury.

**5.** Neither the W. C. company nor the defendant had any control over the employees of the other, except that upon the track in question the W. C. train-men were required to obey the rules prescribed

by the defendant's general manager and the special orders given by the defendant's train-dispatcher. *Held*, that plaintiff's intestate was not a fellow-servant of the men in charge of the defendant's train whose negligence caused the accident.

APPEAL from the Circuit Court for *Fond du Lac* County. The case is thus stated by Mr. Justice CASSODAY:

"By agreement the trains of the Wisconsin Central Railroad Company had the privilege of running upon and over the defendant's line of road between Milwaukee and Schwartzburg, a distance of about nine miles. Such trains were to run "on such times, running orders, and regulations as might from time to time be fixed and prescribed" by the general manager of the defendant, and be under the exclusive jurisdiction and control of the defendant. West Milwaukee station is on that line, and two miles west from Milwaukee depot. Summit Side Track is on that line, and two miles west of that, or four miles out from Milwaukee depot; and Schwartzburg is about five miles west from Summit Side Track. Going west from West Milwaukee to Summit Side Track there is a heavy up-grade. On the morning of February 28, 1882, the defendant's regular freight train No. 11 started from Milwaukee depot on the regular time, 5:45 A. M., and reached West Milwaukee on the regular time at 6 A. M.; but in going from there to Summit Side Track it was obliged to cut the train in two and mount the grade by taking a part of the train at a time. The defendant's regular mixed train No. 3 started from Milwaukee depot on the regular time, 6:45 A. M., and reached West Milwaukee on the regular time at 7 A. M.; but on approaching No. 11 on the track it was signaled by the latter, and its engine assisted that train up the grade and then took its own train up to Summit Side Track, so that before and at 7:32 A. M. No. 11 was on the main track at Summit Side Track; and at the same time No. 3 was on the side track at Summit Side Track. On that same morning the conductor

and engineer of the Wisconsin Central freight train in question received orders from the defendant's train dispatcher to leave Milwaukee with that freight train at or after 7 A. M., "and run wild from Milwaukee to Schwartzburg, keeping clear of regular trains." In obedience to such orders the Central train in question left Milwaukee at 7 A. M. and reached West Milwaukee at 7:15 A. M., when it stopped to take orders and registered, and then started on towards Summit Side Track at 7:16 A. M., and reached the latter place at 7:32 A. M. The morning was cold, and so foggy that the engineer of that train could see no more than ten or fifteen feet ahead of his engine. At that point the Central train ran into the rear end of No. 11 there upon the main track. When the collision occurred Richard McBride, the head brakeman on the Central train, was standing in the gangway between the tender and engine, and was killed by the collision. None of the Central cars were thrown from the track.

"The plaintiff brings this action to recover damages by reason of the intestate's death. On the trial there was a verdict for the plaintiff, and from the judgment entered thereon the defendant appeals."

For the appellant there was a brief by *John W. Cary*, attorney, and *Burton Hanson*, of counsel, and oral argument by *Mr. Hanson*. They contended, *inter alia*, that the trainmen of the Wisconsin Central train were negligent in running into Summit Side Track station in the manner they did, and that the accident was wholly chargeable to such negligence. *McDade v. Georgia R. & B. Co.* 58 Ga. 73; *S. C.* 18 Am. R'y Rep. 183; *Doggett v. Ill. Cent. R. Co.* 34 Iowa, 284; *Sprong v. Boston & Alb. R. Co.* 60 Barb. 30. The negligence of the conductor and engineer of that train was the negligence of all parties on the train, including plaintiff's intestate. *Prideaux v. Mineral Point*, 43 Wis. 513; *Otis v. Janesville*, 47 id. 422; *Houfe v. Fulton*, 29 id. 296; *L. S. &*

*M. S. R. Co. v. Miller*, 25 Mich. 274; *Payne v. C., R. I. & P. R. Co.* 39 Iowa, 523. The accident was a risk incident to the employment of the deceased. While running over the defendant's track on the Wisconsin Central trains he assumed the risk of being injured by the carelessness of the men in charge of the defendant's trains. They were all fellow-servants engaged in a common employment and under the same general control while passing over the track between Milwaukee and Schwartzburg. Wood on M. & S. sec. 435; *Mills v. O., A. & M. R. Co.* 2 MacArthur, 314; *I. C. R. Co. v. Cox*, 21 Ill. 20; *Clark v. C., B. & Q. R. Co.* 92 id. 43; *Johnson v. Boston*, 118 Mass. 114; *Wiggett v. Fox*, 11 Exch. 832; *Rourke v. White Moss C. Co.* L. R. 1 C. P. Div. 556; *S. C.* 18 Eng. (Moak), 191. The court erred in admitting the pretended letters of administration issued to the respondent. The complaint alleges that the plaintiff's intestate died without leaving any property, and the widow testified to the same fact. In such a case the court had no authority to issue letters of administration. R. S. sec. 3806.

*Gabe Bouck*, for the respondent.

CASSODAY, J. The action could only be brought by and in the name of the personal representative of the deceased. Sec. 4256, R. S. The answer denied the appointment of the plaintiff as administrator. There was no error in admitting in evidence the letters of administration issued to the plaintiff.

There was no error in allowing the plaintiff to prove the exact condition of things at Summit Side Track; that there was no depot, no depot grounds, nor any person stationed there; that there was only the main track, side track, and switches at each end. The time-table in evidence showed it to be a "signal station." These facts were undisputed, and the error assigned because the court repeated them to the jury is without foundation. The addition of the re-

mark that "the only person who could give signals at that point would be men connected with trains stopping at that point" was an inevitable conclusion from the uncontroverted facts, and hence was no error. Upon the evidence stated, who else would be there to give such signals? In the absence of all trains at Summit Side Track, there would necessarily be an absence of all signals at that place, unless given by persons not connected with either company. This being so, the absence of any signal at that place, especially on a morning like the one in question, would naturally induce the inference that no train was there. There would be no propriety in calling it a "signal station," if every train was required to stop there in the absence of any signal.

The question whether the conductor, engineer, or servants on board the Wisconsin Central train were negligent in running or managing that train, under the facts and circumstances disclosed in the evidence, was submitted to the jury, with direction to find for the defendant if any of them were negligent. The verdict for the plaintiff was a finding that none of them were negligent.

Exception is taken because the court instructed the jury in effect that "while the servants in charge of the Central train . . . were running at that time under special orders, yet the servants on that train were bound to observe the rules of the defendant . . . so far as they did not conflict with the special orders which they had" received. The "special orders" were to "run wild from Milwaukee to Schwartzburg, keeping clear of *regular* trains." Of course, a wild train under special orders was bound to obey such orders. The very object of giving *special* orders may be to relieve those in charge of a particular train from being governed by one or more of the general rules. The "movement of trains by telegraph" necessitates special orders by telegraph. The eight printed rules under that head all relate to such special orders. Thus, "When a train

has orders to run regardless of a *specified* train, it gives the train under such orders no right over *another* train." So, " No train shall assume the rights or take the time of any other train without special orders." That is to say, as the court in this case in effect did say, a train under special orders is bound to observe the general rules, except·in so far as they conflict with such special orders. The instruction referred to was not misleading. For the same reasons, it was not error to instruct the jury, in effect, that " it was the duty of the engineer and conductor " of the Central train "to be on the lookout for signals " on approaching Summit Side Track, "so that they might avoid a collision at that place if there was a train.upon the track." For the same reasons, it was not error to instruct the jury, in effect, that " it was the duty of the men in the charge of the . . . Central train to observe the rules of the defendant, . . . and . . . to look out for *regular* trains which might be upon the road." Such, in effect, were the special orders in question.

But what is to be deemed a "regular train "? Freight train No. 11 was due at Schwartzburg half an hour before the Central train left Milwaukee, and three quarters of an hour before it left West Milwaukee; and yet no reference was made in the special orders to the fact of that train being behind time; but, on the contrary, the orders were to run *wild* to Schwartzburg, which indicated that the road was clear to that point so far as No. 11 was concerned. Was that to be regarded as a regular train after it ceased to run on regular time? When struck, it was an hour and seventeen minutes behind time. Should not the men in charge of the Central train have been notified of the fact that No. 11 was behind time? True, mixed train No. 3 was not due at Schwartzburg until four minutes after the Central train had left West Milwaukee, but had it been on time it would then have been some three miles west of Summit

Side Track. Its time was faster than No. 11, and faster than the speed of the Central train. But still it was liable to get behind time, and there had been no opportunity for notifying the men in charge of the Central train that it was behind time at Schwartzburg, and so they were bound to be on the lookout for signals from that train, as the jury were instructed by the court.

The engineer of the Central train testified, in effect, that he went from West Milwaukee up to the Summit, using the caution of whistling around every curve, as well as crossing; that in coming to the Summit he had all but shut off his engine, and as the fog was so dense he had his head out of the window, and kept his eye peeled for anything that might happen; that he saw a dark object, as it was, in the fog, and sang out, "Jump, for Christ's sake!" but almost as soon as he got the words out the collision occurred; that when he saw the dark spot, he reversed the engine, plugged her, and squealed for brakes, and that there was no possible way of stopping the train sooner than he did; that there was no signal, warning, guard, or anything; that when he first saw the end of the train ahead of him, he had passed the first switch about 100 or 120 feet, and No. 11 was backing towards him. Whether they were bound to exercise still greater care, or perform a still more stringent duty, is another question.

It is urged that the undisputed evidence shows that the men in charge of the Central train violated the printed rules in running into Summit Side Track at the rate of speed they did. The rules relied upon by the defendant provided in effect that "trains will start from Milwaukee . . . on their card time." Under this, the men in charge of the Central train were bound to assume that No. 11 and No. 3 would leave Milwaukee "on their card time." Again, " Care must be used in coming into all stations. Always approach a station on the supposition that a train *is to be met there* and

is standing upon the main track." But the special orders were to *run wild* except as to regular trains, and no such train was due at that place at that time. So the last clause of the rule quoted is in conflict with the special orders given, and hence were to be disregarded by the men to whom they were given. Besides, that clause of the rule only contemplated the *meeting* of trains at stations, that is, trains approaching each other from opposite directions, and not to trains following each other in the same direction. Those seem to be provided for by other rules. The rules provided that "freight trains will not exceed ten miles an hour passing stations." This indicates the speed at which a freight train is permitted to pass a station at which it is not required to stop. Evidently the Central train did not exceed the speed indicated. At least there was evidence authorizing the jury to find that it did not. It was sixteen minutes running from West Milwaukee to Summit Side Track, a distance of only two miles. This indicates that the average of the run was a mile in eight minutes, or seven and a half miles per hour.

The rules further provided that " conductors and brakemen of freight trains approaching stations must be out on their trains at least one mile from every station." It is claimed that this applied to Summit Side Track. It appears that after the train left West Milwaukee, the conductor went upon the engine and sat in the fireman's seat, and remained there until the collision, and that the head brakeman rode for a short distance on the tender, and then went into the gangway between the tank and the engine, and stood there until the collision. There was but one other brakeman on the train, and there is no evidence as to where he was. These are claimed to be violations of the rule, and hence negligence in the management of the train. On such a foggy morning it would seem that the conductor took the best position possible for observation and giving warning.

But, assuming that Summit Side Track was one of the stations referred to in the rule, and that the conductor and head brakeman were not in the places required by the rule, yet, as it was so foggy at the time that the engineer could not see more than fifteen feet ahead of the engine, it is very evident that neither the location of the conductor nor head brakeman in any way tended to bring about the collision, or that their location elsewhere could have prevented it. Their location elsewhere would have been of no service in giving warning of undiscoverable danger, nor to put on brakes in pursuance of a signal which could not be given in time to escape the collision. These things being so, such improper location, if negligence at all, was exceedingly remote, and in no way contributed to the collision. *Pease v. C. & N. W. R. Co.* 61 Wis. 166, 167.

Under all the facts and circumstances of the case, we think there was no error in submitting to the jury the question whether there was any negligence in the management of the Central train.

It is claimed that the fact that the deceased was in such gangway at the time of the collision contributed to his injury, and hence that the plaintiff cannot recover. The argument is that had he been at his post on the top of the freight cars, he would not have been injured, as none of them were thrown from the track. But he is not to be held responsible for the non-expectation of a collision, much less for just such a collision and just such consequences as followed. His negligence, if it can be called negligence, was a mere condition of the injury. As well might it be said that had he ridden in the caboose or on the engine, contrary to the rule, he would not have been injured. The collision was the proximate cause of the injury. His being in the gangway was not the juridical cause of the injury. It may have been a remote causation,— sometimes called remote negligence,— but it is

too remote to be of any significance here, and hence the plaintiff is not to be thereby precluded from recovery. We cannot say there was any error in submitting to the jury the question of the deceased's contributory negligence.

Is there any evidence tending to show negligence on the part of the defendant? As already observed, there was a failure to notify the men in charge of the Central train that No. 11 was behind time at Schwartzburg, notwithstanding there was three quarters of an hour in which to give such notice before the Central train left West Milwaukee. So it has been observed that at the time of the collision No. 11 was an hour and seventeen minutes behind time, and was backing on the main track towards the Central train; that No. 3 was twenty-five minutes behind time; and that there was no signal, warning, guard, nor anything to inform the men in charge of the Central train that the other trains were behind time, nor of their approaching danger. Was there any duty on the part of the men in charge of No. 11, or No. 3 to give such signals or warnings? One of the defendant's printed rules expressly required that " in case of accident *or* unavoidable *delay* to a train or an engine on the main track *from any cause,* conductors must *immediately* station men with a red flag by day, or red lights and torpedoes by night, *half a mile* distant, in both *directions,* to warn approaching trains. Should it become necessary to *back* a train or engine, great care must be observed, by running very slowly, *and sending a flag-man well in advance,* to insure safety in case of meeting. *Trains are liable to be followed at all times."* This rule seems to have required the men in charge of No. 3, and it certainly required the men in charge of No. 11, to give the warnings therein indicated, for they were both unavoidably delayed, and No. 11 was upon the main track, and also backing at the time. The mere fact that that was a " signal station " did not do away with the requirement to give signals to trains liable to fol-

low, for the rule said that "trains are liable to be followed at all times." After reading this rule there can be no doubt but what there was evidence to go to the jury on the question of the defendant's negligence in the particulars just mentioned; and it might well have been claimed that the court was authorized to instruct the jury, upon the undisputed evidence, that the failure to give such signals was negligence.

It is urged that although the men in charge of No. 11 and No. 3 were negligent by failing to give signals, yet that they were all co-employees with the deceased, and hence that the injury was one of the risks of the service, and therefore the plaintiff cannot recover. Several cases are cited in support of this contention. The case most relied upon is *Clark v. C., B. & Q. R. Co.* 92 Ill. 43, where an employee sued his employer, not for any fault or negligence of the latter, but for the fault and negligence of its lessee while using a portion of its track. But we shall not undertake to analyze the cases cited. The question is familiar to the courts and the profession. It is believed that the facts stated in this case distinguish it from any of those cited. The men in charge of No. 11 and No. 3 were employed and paid by the defendant, and were liable to be discharged by it for any neglect of duty. The Central Company had nothing to do with the selection of any of them, and had no power to dismiss them. The deceased and the men in charge of the Central train were not employed nor paid by the defendant, but by another different and independent corporation. Neither corporation had any control over the men in the employ of the other except that upon a few miles of railroad the train-men of the Central Company were required to obey the rules and regulations prescribed by the general manager of the defendant for both companies, and were bound to obey the special orders of the defendant's authorized agents. But a general manager who

prescribes rules, or a train dispatcher who gives special orders, is not a fellow-servant with the employees in charge of the train. *Darrigan v. N. Y. & N. E. R. Co.* (Conn.), 24 Am. Law Reg. 452. The two corporations got their authority from entirely different charters, were doing an entirely different business, and were wholly independent of each other except as indicated. The agreement mentioned between the two companies imposed obligations and duties from each to the other, and consequently to the respective train-men of each. We cannot hold that the deceased was a fellow-servant with the men in charge of No. 11 or No. 3.

*By the Court.*— The judgment of the circuit court is affirmed.

See note to this case in 25 N. W. Rep. 549.— REP.

