BRADY v. CHICAGO & G. W. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. March 3, 1902.)

No. 1,543.

1. MASTER'S AND SERVANT'S DUTY IN OPERATION OF RAILROAD—NEGLIGENCE.

The duty of so operating a safely constructed and equipped railroad, subject to the rules and general supervision of the master, as to keep it reasonably safe for those employed upon it, is not a positive duty of the master, but a primary duty of the servant.

2. CARRIERS—LIABILITY TO PASSENGERS OF RAILWAY COMPANY OPERATING OVER ANOTHER RAILROAD.

A railroad company operating its trains over the railroad of another corporation by permission is liable to its passengers for the negligence of the servants of the licensing corporation.

3. MASTER AND SERVANT—LIABILITY TO SERVANTS OF RAILWAY COMPANY OPERATING OVER ANOTHER RAILROAD.

A railway company running its trains over another road by permission is liable to its employés for the negligence of the servants of the licensing corporation in the discharge of the absolute duties of the master.

4. SAME.

But such a railway company is not liable to its servants for the negligence of the employés of the licensing corporation in the discharge of their duties as servants.

5. SAME—RESPONDEAT SUPERIOR—POWER OF CONTROL TEST OF APPLICATION.

The power of the alleged master or principal to command or direct the alleged servant or agent is the test of the liability of the former for the acts of the latter, under the maxim respondeat superior. If the master or principal has no power to command or direct the alleged servant or agent, he is not responsible for his acts, because there is no superior to respond.

6. SAME—EMPLOYE OF RAILWAY COMPANY NOT FELLOW SERVANT OF EMPLOYE OF DEPOT COMPANY.

The G. W. Ry. Co. was operating a train through the yards of a depot corporation, under the customary contract for the use of the yards and depot jointly with other companies having like contracts, when one of its employés was killed by the alleged negligence of the servants of the depot company in failing to properly turn the switches, which were under the control of the latter company. Held the switchmen of the depot company were not the fellow servants of the employés of the railway company, nor were they the agents or servants of that company, within the meaning of the fellow servant statute of Minnesota (St. 1894, § 2701).[1]

7. SAME—RESPONDEAT SUPERIOR—TERMINAL YARDS—CONTRACT FOR USE OF CREATES NO PARTNERSHIP OR AGENCY.

The ordinary contracts between a depot corporation and several railroad companies for the use of a depot and transfer yards do not establish a partnership relation between the companies, nor make the depot corporation the servant or agent of the railroad companies, so that they become liable for the negligence of its servants, under the maxim respondeat superior.

Caldwell, Circuit Judge, dissenting.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Northern District of Iowa.

[1] Who are fellow servants, see note to Railroad Co. v. Smith, 8 C. C. A. 668; Railway Co. v. Johnston, 9 C. C. A. 596; Flippin v. Kimball, 31 C. C. A. 286.

Charles A. Clark (James W. Clark and William G. Clark, on the brief), for plaintiff in error.

Carroll Wright (A. B. Cummins and James P. Hewitt, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. Elizabeth Brady, as administratrix of the estate of John J. Brady, brought an action against the Chicago & Great Western Railway Company for negligence resulting in the death of Brady, and at the close of the evidence produced on her behalf the court instructed the jury to return a verdict in favor of the defendant. The judgment, based upon this instruction, is challenged by this writ of error.

The facts established at the trial were these: John J. Brady was the foreman of a switch crew in the employment of the Chicago & Great Western Railway Company, engaged in discharging the customary duties of such crews at the city of St. Paul. In the early morning of November 1, 1896, while it was yet dark, it became Brady's duty to take his train, which consisted of an engine, tender, and caboose, from West St. Paul across the Mississippi river, and through the yards of the St. Paul Union Depot Company, to Mississippi street, a distance of two or three miles. He had exclusive charge of this train, and he directed the crew to couple the caboose on to the rear of the engine, and to back the train across the river and through the yards. He took his station on the forward end of the caboose as it was sent into the darkness. The only light he had at that end of the train was a lantern. As he was backing this train through the yards at a speed of about six miles an hour it collided with a refrigerator car on a portion of one of the transfer tracks of the depot company, called the "dead track," and so injured Brady that he died. This dead track was long enough to hold four or five cars. It was used by several railroad companies as a place of deposit of cars that were ready to be transferred from one railroad to another. It was provided with a switch at each end, by means of which trains could be sent around it when it was occupied by cars. When the switches were turned to send trains around it they displayed red switch lights, and when the dead track was clear, and was lined up with that on which Brady approached it, the switches displayed green lights. At such times it formed a part of the main track through the depot yards used by the defendant for the passage of its freight trains. At the time of the accident the switch lights were green, thus indicating that the dead track was clear. It was not the duty or the privilege of the servants of the Great Western Railway Company to operate these switches. The dead track, the switches connected with it, and all the railroads and switches in this yard were the property of the St. Paul Union Depot Company, a corporation of the state of Minnesota. This company had the exclusive management and control of all these tracks and switches, and the Great Western Railway Company had a contract with it for a transfer of its cars and engines and for permission to run its trains through

the yards. Six other railroad companies had similar agreements with the terminal company. The depot company employed three or four switchmen whose exclusive duty it was to throw the switches in the yards for those who were entitled to use them under these contracts. The dead track on which the accident happened was used largely in the daytime for the deposit of cars to be transferred from railroad to railroad, but it was used at night only for special work, such as perishable freight and stock. One of the plaintiff's witnesses said that from his experience it was lined up anywhere after 10 o'clock at night until 5 o'clock in the morning so that it was proper to proceed without delay or bothering a switch tender to be there; that there was liable to be some transferring at night, and the placing of cars upon this dead track; that all the trainmen and switching crews knew that this track was used for standing cars; and that the customary way of protecting these cars on this dead track was to set the switches so that they would display red lights, and send approaching trains around it. He also testified as follows:

"The crew of one railroad company would set cars there, to be afterwards received and taken by the crew of another company. But the cars were to be immediately afterwards taken or protected. To the best of my knowledge, they were always immediately taken or else protected. If they were protected, then they might remain there for some considerable length of time. It is a piece of track that is busily used for transfer work, and very seldom anything stands there long, but there may be some delay where they could not possibly get the car, and it would stay there for half an hour. They couldn't allow anything to stand there any longer, you know, to make a rule of it. It is true that this dead track was very much in use, and that cars were frequently stood there for a greater or less length of time,—freight cars which were not attached to an engine. At various times in the evening they wouldn't even allow you to cut your engine from the car there at all, and leave it there. You could stay right there and hold the car until the other engine was ready to take right hold of it; that is, at certain times. The Union Depot yards at the place in question are very thickly laid and covered with switches. The yards at that time consisted of almost a complete network of railway tracks running in all directions, used by the various railroad companies I have referred to and by the Union Depot Company for transferring, switching, and handling freight trains, and also passenger trains. * * * It was not defendant's custom to have any one at the dead track in question to watch or protect cars placed upon the dead track by other companies. It was the custom for the Union Depot switch tenders to protect those cars."

There was no evidence that the defendant or any of its servants placed the refrigerator car with which Brady's train collided upon the dead track.

Upon this state of facts counsel for the plaintiff in error insist that the direction of the court to the jury to return a verdict for the defendant was erroneous (1) because the railway company was liable for the negligence of the depot company in its discharge of the positive duty of the master to exercise ordinary care to provide a reasonably safe place for the servant to work, and there is some evidence of such negligence on the part of the terminal company; and, (2) because the servants of the depot company were the fellow servants of the employés of the railway company, there was some evidence that the servants of the former company were negligent in the discharge of their primary duties as servants, and under the statute of Minnesota

a railway company is liable to its employés for injuries inflicted upon them by the negligence of their fellow servants.

Before entering upon a discussion of these contentions, it will be well to fix clearly in mind the negligence and the nature of the negligence which was the cause of this deplorable accident. Was it negligence in the construction, repair, or maintenance of the road, its switches and appurtenances, or was it carelessness in their operation? for the line of demarkation which separates the absolute duty of the master from the primary duty of his servants lies here. It is the duty of the railroad company to use ordinary care to furnish a reasonably safe railroad machine; to exercise reasonable diligence to keep it in repair; to use ordinary care to employ a sufficient number of reasonably competent servants to operate it; to establish reasonable rules for, and to exercise proper supervision of, its operation. But when this duty is performed an equally positive duty rests upon the servants to keep the great machine from becoming dangerous by their operation of it and to work it with reasonable care. The railroad tracks, the switches, the engine, and the caboose were on November 1, 1896, well constructed and in good repair. If they had been operated with ordinary care, they would not have caused the death of Brady. If the servants who put the refrigerator car on the dead track had placed red lights upon it, if when it was placed there the switchmen of the depot company had turned the switches so as to display red lights and so as to send Brady's train around it, or if Brady had run his train through the yard in the dark with the engine and its blazing headlight foremost rather than the caboose (Southern Pac. Co. v. Yeargin, 48 C. C. A. 497, 109 Fed. 436), the fatal result could not have followed. The failure to do these things was negligence, but it was not negligence in the discharge of any duty of the master. It was negligence in the discharge of the duties of the servants; negligence in the operation of the railroad machine, which had been safely constructed and maintained, and which was made dangerous by the negligent discharge of the duties of these servants in its operation. Railroad Co. v. Needham, 63 Fed. 107, 109, 11 C. C. A. 56, 58, 59, 27 U. S. App. 227, 231; Railroad Co. v. Mase's Adm'x, 63 Fed. 114, 115, 11 C. C. A. 63, 64, 27 U. S. App. 238, 240.

Bearing in mind the nature of the negligence which caused the accident, let us now consider the first position of counsel for the plaintiff in error. It is that the defendant was liable for the death of Brady because the depot company was negligent in the discharge of the positive duties of the master. The defendant was operating its trains in the yard and over the railroads of the depot company under a contract which excluded it from all management and control of this yard, its railroads and switches, and imposed upon the depot company exclusively all the positive duties of the master in this regard. The rules of law governing the liability of a railroad company while running its trains over the railroad of another corporation are too well settled to admit of discussion. Such a company is liable to passengers and shippers for the causal negligence of the licensing company and of its servants, whether this negligence occurs in the discharge of the positive duties of the master or in the performance of the primary

duties of the servant. Railroad Co. v. Barron, 5 Wall. 104, 18 L. Ed. 591; McElroy v. Railroad Corp., 4 Cush. 400, 402, 50 Am. Dec. 794; Central Trust Co. v. Denver R. G. R. Co., 97 Fed. 239, 38 C. C. A. 143; Murray v. Railroad Co. (Conn.) 34 Atl. 506, 508, 32 L. R. A. 539. The reason for this rule is that the carrier contracts with the passengers and shippers to carry them and their property with reasonable safety, and the failure so to do is equally a breach of this contract, whether it results from negligence in the discharge of the duties of the master or of those of the servants. There is, however, no such contract between the railroad company and its employés. Their relations and their liabilities are governed by the relative duties imposed upon them by the law. They join in a dangerous occupation. The servants know its dangers as well as the master. If they are operating over the railroad or in the yards of a corporation which does not employ them, they are aware of that fact and of the risk of accident from the negligence of the employés of that corporation. All these risks which they know, or which they might know by the exercise of reasonable prudence and diligence, excepting only those dangers which it is the positive duty of the master to protect them from, they assume as between themselves and their master when they enter upon and continue in the employment. They may undoubtedly recover of those who are guilty of the negligence which causes their injury just as they may recover of any stranger who commits a tortious act that inflicts injury upon them while they are operating their trains. This is all that the cases of Lockhart v. Railroad Co. (C. C.) 40 Fed. 631, and McMarshall v. Railway Co., 80 Iowa, 757, 45 N. W. 1065, 20 Am. St. Rep. 445, cited by plaintiff in error's counsel, decide.

But their master does not assume and is not liable to them for the negligence of the servants of the licensing company when the latter are not engaged in the discharge of the positive duties of the master. Clark v. Railroad Co., 92 Ill. 43; Byrne v. Railroad Co., 9 C. C. A. 666, 61 Fed. 605, 608, 24 L. R. A. 693; Miller v. Railway Co., 76 Iowa, 655, 659, 39 N. W. 188, 14 Am. St. Rep. 258; Hilsdorf v. City of St. Louis, 45 Mo. 94, 98, 100 Am. Dec. 352.

On the other hand, the master cannot renounce his absolute duties to his servant, or so delegate them to another as to relieve himself from liability for their discharge, and a railroad company which operates its train over another's road remains liable to its servants for any failure of the employés of the latter in their discharge of the positive duties of the master. Stetler v. Railway Co., 46 Wis. 497, 1 N. W. 112; Harding v. Transfer Co. (Minn.) 83 N. W. 395; Railroad Co. v. Dorsey (Tex. Sup.) 18 S. W. 444.

The Great Western Railway Company, therefore, was liable to the plaintiff for any negligence of the servants of the depot company in the discharge of the absolute duties of the master which contributed to the death of Brady, and for that negligence only; and the first question presented to the court was whether or not the testimony presented any substantial evidence of such negligence which would warrant the jury in returning a verdict to that effect. There is always a preliminary question for the judge at the close of the evidence before a case can be submitted to the jury, and that question is not whether

or not there is any evidence, but whether or not there is any substantial evidence upon which the jury can properly render a verdict in favor of the party who produces it. Railway Co. v. Belliwith, 83 Fed. 437, 441, 28 C. C. A. 358, 362, 55 U. S. App. 113, 121; Association v. Wilson, 100 Fed. 368, 370, 40 C. C. A. 411, 413; Commissioners v. Clark, 94 U. S. 278, 284, 24 L. Ed. 59; North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 733, 8 Sup. Ct. 266, 31 L. Ed. 287; Railway Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Laclede Fire-Brick Mfg. Co. v. Hartford Steam Boiler Inspection & Ins. Co., 60 Fed. 351, 354, 9 C. C. A. 1, 4, 19 U. S. App. 510, 515; Gowen v. Harley, 56 Fed. 973, 6 C. C. A. 190, 12 U. S. App. 574, 585; Motey v. Granite Co., 74 Fed. 155, 157, 20 C. C. A. 366, 368, 36 U. S. App. 682, 687.

It is not claimed that the railroad, the switches, or any of the apparatus of the Union Depot Company were defective, or that there was any negligence in their construction or maintenance. It is, however, urged that there was evidence that that company was negligent (1) in promulgating reasonable rules, (2) in failing to employ a sufficient number of switchmen, and (3) in exercising control and supervision of the operation of its yard. The argument in support of this position proceeds upon the assumption that there was evidence in this record from which the inference may properly be drawn that there was no rule or supervision of the depot company which required a switchman to be in attendance in the yards and to protect cars placed upon the dead track by turning the switches between 11 o'clock at night and 5 o'clock in the morning. But this assumption is unwarranted by the evidence. It rests on this statement of one of the witnesses: "From my experience these tracks were lined up anywhere after 11 o'clock at night until 5 o'clock in the morning, so that it was proper to proceed without delay or bothering a switch tender to be there." This testimony does not indicate that no switchman was required to be there or that no switchman was there during these hours. It tends to show that there was one in attendance, because it speaks of bothering him, and, if he had not been there, he could not have been bothered. If it shows anything, it proves that there were one or more switchmen in attendance, but that it was proper for Brady to proceed without bothering them, because at the hour when he passed through the yards the tracks were usually lined up and clear. Other portions of the testimony of this witness make it plain that it was the custom and practice of the depot company to have switchmen in the yards, to protect cars left on this dead track, at all hours of the day and night. He says:

"There was liable to be some transferring at night, and placing of cars on the dead track. * * * It was the duty of the switch tenders employed by the Union Depot Company to set the switches in this locality, including the switches that led to and from the transfer track referred to. * * * The crew of one railroad company would set cars there to be afterwards taken and received by the crew of another company, but the cars were to be immediately afterwards taken or protected. To the best of my knowledge, they were always immediately taken or else protected. * * * It was not the defendant's custom to have any one at the dead track in question to watch or protect cars placed upon the dead track by other companies. It was the custom for the Union Depot switchtenders to protect those cars."

The plain effect of this testimony is that, while it was not the duty or the custom of the defendant to protect these cars, it was the invariable custom and the practice of the switch tenders of the depot company to do so, both by night and by day.

Now, the burden was on the plaintiff to prove the negligence upon which its counsel relies. The legal presumption was that the depot company made and announced reasonable rules, and that it exercised reasonable supervision. Conceding that it should have made such rules, and should have exercised such supervision, that it would have been the duty and the practice of its switchmen to protect this refrigerator car on the dead track by turning the switches at night, the legal presumption is that it made such rules and exercised such supervision. There is no evidence to the contrary, and the necessary inference from the testimony is that this terminal company fully discharged its duty, for the evidence is that it was the duty and custom of all the switchmen to protect these cars, and the only conceivable way in which this duty could have been imposed and this custom established was by a rule and supervision which required it. Such a rule and supervision constitutes the discharge of the whole duty of the depot company in this regard. It was not required to go farther. The duty of supervision does not require a master to place a spy or a watchman by the side of each switchman or employé to see that he discharges his duty. It is enough that reasonable rules are established and made known to him, and that a supervision and control are exercised which establish the custom of compliance with them. The legal presumption is that the servant as well as the master will discharge his duty, and upon this presumption the master has the right to rely in the performance of his duty. There was no evidence in this case which would have sustained a finding of the jury that there was any negligence on the part of the depot company in promulgating rules for, or in exercising supervision over, the operation of its railroads and yards.

There is no claim that it did not employ competent servants, but it is said that it did not engage a sufficient number of them. The suggestion is without support in the evidence. The only testimony on the subject is that there were something like 100 switches in the yard, and three or four switchmen, who did nothing but throw them. There was no evidence that these switchmen were at any time insufficient in number to speedily and carefully work the switches, much less that they were so in the night when this accident happened and when the business in the yard was necessarily light. Nor was there any evidence that the accident was the effect of a lack of employés. The result is that there was not only no evidence from which the inference could have been fairly drawn that the depot company was guilty of negligence in the discharge of any of the positive duties of the master, but the legal presumptions and the testimony alike concur in establishing the conclusion that it completely discharged these duties, and that the sole cause of the accident was the negligence of one or more servants in the discharge of the primary duties imposed upon them. The defendant, therefore, was not liable on account of its

own negligence or on account of the negligence of the depot company in the discharge of the absolute duties of the master.

The second proposition of counsel for the plaintiff in error is that the depot company and its employés were fellow servants of Brady and the other employés of the defendant, and that the latter is liable for their negligence in failing to turn the switches and protect the refrigerator car under the Minnesota statute, which reads:

"Every railroad corporation owning or operating a railroad in this state shall be liable for all damages sustained by any agent or servant thereof by reason of the negligence of any other agent or servant thereof, without contributory negligence on his part." St. Minn. 1894, § 2701.

Let it be borne in mind in the consideration of this contention that, if there was any act of negligence on the part of the servants of the depot company established in this case, it was the failure of its switchmen to throw the switches and protect the refrigerator car when placed on the dead track. The question, then, is whether at the time this car was set upon the track, and the switchmen of the depot company failed to turn the switches, they were the agents or servants, or their master was the agent or servant of the defendant, so that the latter may be held for their carelessness under the doctrine of respondeat superior. This question must be answered by a determination of the question whether or not the defendant had the power to command these switchmen, and to direct them what to do and where to do it, when that car was set upon the track. The power of control is the test of liability, under the maxim respondeat superior. If the master cannot command the alleged servant, then the acts of the latter are not his, and he is not responsible for them. If the principal cannot control and direct the alleged agent, then he is not his agent, and the principal is not liable for his acts or his omissions. In such case the maxim respondeat superior has no application, because there is no superior to respond. In an action against an alleged master or principal for the act of his alleged servant or agent under the maxim respondeat superior, there can be no recovery in the absence of the right and power in the former to command or direct the latter in the performance of the act charged, because in such a case there is no superior to answer. Atwood v. Railway Co. (C. C.) 72 Fed. 447, 454, 455; Byrne v. Railroad Co., 9 C. C. A. 666, 61 Fed. 605, 608, 24 L. R. A. 693; Hilsdorf v. City of St. Louis, 45 Mo. 94, 98, 100 Am. Dec. 352; Town of Pawlet v. Rutland & W. R. Co., 28 Vt. 297, 300; Miller v. Railroad Co., 76 Iowa, 655, 659, 39 N. W. 188, 14 Am. St. Rep. 258; Wood, R. R. § 388; Donovan v. Construction Syndicate [1893] 1 Q. B. Div. 629; Rourke v. Colliery Co., 2 C. P. Div. 205.

Let us test the claim of the counsel for the plaintiff by this rule. The defendant was a railway corporation which owned and operated railroads from St. Paul to Chicago and from St. Paul to Kansas City. The depot company was a corporation of the state of Minnesota which owned and operated the union passenger depot and the transfer yard in the city of St. Paul. Its capital stock was $350,000, and this stock had been taken in equal amounts by seven railroad corporations, which used the yard and the depot. It had mortgaged its property for

$250,000.   On January 15, 1894, it made a contract with the defendant in which the parties agreed that the railway company should have the use of the station and yard of the depot company with the other six railroad corporations until 1979, and that it would make this station its main passenger depot in St. Paul; that the depot company would maintain and operate with its own employés its station and its yard; that it would provide all necessary buildings and machinery and all needed mechanics and workmen; that the defendant would pay its proportionate share to be fixed by the board of directors of the depot company of the aggregate annual rental of the property of the latter company, which should consist of the current expenses of maintaining and operating the depot and yards, the interest on its mortgage debt, and a dividend of 6 per cent. on its capital stock, less the income derived from the rent of the use of the privileges in or on the property to others than the seven railroad companies; that the depot company should have the exclusive right and power to establish reasonable rules and regulations for the operation of the property used, and that the railway company should comply with them; that the depot company would permit the railway company to transfer to and receive from other companies passenger and freight cars, engines, and trains through its yard; that the depot company should have the general control, management, and supervision of the passenger depot, grounds, tracks, and railways constituting its property, and of the business conducted thereon; "that inasmuch as the officers, agents, and employés of the party of the first part (the depot company) are in fact employed for and in furtherance of the business of the companies using said grounds" the depot company shall not be liable to the railway company for any damage resulting to the latter from the negligence of the servants of the former, and the railway company will indemnify the depot company against any claims for damages caused by its engines or cars, or by the negligence of the employés of the depot company while acting for or in furtherance of the business of the railway company, or as the mutual servant of both.

Counsel seize upon the stipulation of this contract last quoted, and insist that by it the depot company and its servants are made the agents and the servants of the defendant, because it recites that they are employed for and in furtherance of the business of the companies using the grounds, and because it promises indemnity against their negligence when acting in furtherance of the business of the defendants or as mutual agents of both.   But the relation of the parties to this contract is not to be determined by a single excerpt from it.   It must be found by a careful perusal and interpretation of the entire agreement. When the entire contract is read, the true intent of the parties is ascertained, and the test of the power of the defendant to command and direct the switchmen in the performance of the fatal act of negligence is applied, there can remain little doubt that they were neither the servants nor agents of the defendant, and that it was not liable for their omission.   The express provisions of the contract that the depot company should have the exclusive management and control of the station grounds and railroads and of the business thereon, the exclusive right and power to make rules and regulations for their operation,

and that it should furnish the employés to carry on this business, cannot fail to prevail over the mere recital on which counsel relies for success, and they demonstrate the fact that the defendant company was without any power or authority to control or direct the switchmen in the discharge of any of their duties. It had no right to turn a switch or to command any employé of its own or of any other company to throw one. The limit of its privilege was its right to demand that its cars and trains should be transferred under its agreement; but the exclusive power to determine and to direct its servants how, when, and where this transfer should be made was expressly reserved to the depot company.

The provision that the defendant will indemnify the terminal company against claims for damages arising out of the acts and omissions of the latter's servants while acting in furtherance of the business of the defendant or as the mutual agents of both cannot change the established relations of the parties. It is nothing but a contract of indemnity, and a contract of indemnity does not make the persons against whose acts the indemnity is promised the agents or servants of the indemnifier.

Nor is there anything inconsistent with this conclusion and with the express stipulations of the contract that the depot company shall have the exclusive control and management of its yards and servants in the recital that the latter are employed for and in furtherance of the business of the companies using the grounds. The servants of contractors for the construction of buildings, of railways, and of machinery are employed in furtherance of the business of the parties with whom such contracts are made. But the latter are not the superiors of such servants, within the meaning of the doctrine respondeat superior. In the same way the servants of the depot company were employed for, and in furtherance of the business of, the companies using the yards. Yet not one of those companies was their superior, within the true interpretation of the maxim here invoked, because no one of them had the right to control, direct, or command these servants how, when, or where they should discharge their duties. Their acts and omissions, therefore, were not the acts or omissions of the railway companies, and they cannot be charged with liability for them.

The next contention of counsel is that, if the switchmen were not the general agents of the defendant, yet in the omission to throw the switches when the refrigerator car was set upon the track they were acting in its business, and were its servants pro hac vice. This position is untenable for two reasons. In the first place, the act of negligence was not committed when the switchmen were acting for, or in the business of, the defendant. It was committed when they were acting for, and in the business of, one of the other companies using the grounds, viz., in the business of that company which deposited the car upon the dead track. The testimony is that it was the duty and the custom of these switchmen to protect every car deposited on the track at the time it was left there by then throwing the switches. It was in the transaction of the business of the company which left this car, and not in the transaction of the business of the defendant or of any other company, that this duty devolved upon the switch-

men. This is demonstrated by the fact that this duty never would have been imposed upon them at all if the car had not been left upon the track. Before it arrived there the switches and the track were in proper position for the passage of the defendant's train. If the car had not been placed there, no change of the switches, no act on their part, would have been required of the switchmen. The deposit of the car imposed upon them the duty to immediately throw the switches to protect it. This duty would have been as fully imposed and the negligence of these switchmen would have been as complete if the defendant had never run another engine or train upon the tracks after the car was deposited. The fatal act of negligence was not committed in furtherance of any business of the defendant, and it is only when the servant of another is engaged in transacting the business of the defendant that he can be held to be the latter's servant pro hac vice.

In the second place, if the switchmen had committed the act of negligence in furtherance of the business of the defendant, they would not have been the servants of the latter, because by the express terms of the contract between the two corporations and by the testimony these switchmen would not have been subject to the control or the direction of the defendant. The testimony is that they were employed and paid by the depot company, that they had exclusive control of the switches, and that no servant of the defendant was permitted to touch them. The contract is that the depot company has the exclusive management and control of the grounds, railways, business, and necessarily of the employés who do the business of that corporation. This stipulation vests this power of control and direction of the switchmen in the depot company just as absolutely, and deprives the defendant of it just as completely, when they are assisting to transact the business of the latter, as when they are acting in furtherance of the business of other railway companies or of the depot company. They could not, therefore, have been the servants pro hac vice of the defendant in the transaction of its business in this yard, because they could not have been subject to its command or direction, under the contract and the testimony. Railroad Co. v. Craft, 16 C. C. A. 175, 69 Fed. 124, 129; Railroad v. Stoermer, 2 C. C. A. 360, 51 Fed. 518, 520; Kastl v. Railroad Co., 114 Mich. 53, 55, 58, 72 N. W. 28; Phillips v. Railway Co., 64 Wis. 475, 486, 25 N. W. 544; Sawyer v. Railroad Co., 27 Vt. 370, 380; Zeigler v. Railroad Co., 52 Conn. 543, 555, 556; Railroad Co. v. Armstrong, 49 Pa. 186; Philadelphia, W. & B. R. Co. v. State, 58 Md. 372.

The cases cited by counsel for the plaintiff in error where, as in Rourke v. Colliery Co., 46 Law J. C. P. 283, an employer lends his men to another to perform services for him and under his direction; as in Johnson v. City of Boston, 118 Mass. 114, where he rents them to a city to work with its servants under its direction in constructing a sewer; or as in Ewan v. Lippincott, 47 N. J. Law, 192, 54 Am. Rep. 148, and Wiggett v. Fox, 11 Exch. 832, where he furnishes them to others to perform services for them under their control; or as in Railway Co. v. Peyton, 106 Ill. 534, 46 Am. Rep. 705; Vary v. Railroad Co., 42 Iowa, 246; Taylor v. Railroad Co., 45 Cal. 323; Miller

v. Railroad Co., 154 Pa. 474, 26 Atl. 779; and Mills v. Railroad Co., 2 MacArthur, 314,—where, under the agreement between two individual companies, the employé of the one becomes subject to the control and direction of the other in the very matter wherein the negligence is committed,—are plainly distinguishable from the case before us by the fact that in each of these cases the power to command, direct, and control all the employés in respect to the negligent act was vested in the master of the servant injured. The case of Murray v. Railroad Co. (Conn.) 34 Atl. 508, 32 L. R. A. 539, is not in point, because the cause of action in that suit was based on a contract with a passenger; and the case of Railroad Co. v. Dorsey (Tex. Sup.) 18 S. W. 444, has no application to this issue, because the negligence there charged was a breach of one of the absolute duties of the master resulting in a defect of the cars and track.

In the case in hand Brady was employed, paid, and commanded by the defendant. The switchmen were employed, paid, and directed by the depot company. Neither corporation had any control over the men in the employment of the other; neither corporation could select, employ, or discharge them. The defendant never had any right or power to direct the switchmen of the depot company what to do or where or how they should discharge their duties. Their acts, therefore, were not its acts, it was not liable for their negligence, and they were not the fellow servants of Brady.

Finally, it is contended that the seven railroad companies which held the stock of the depot company were partners, and that each of them is therefore the co-employé of all the servants of the depot company and liable for all their torts. In the discussion of this proposition cases are cited wherein one corporation which held all the stock of another owned a part of its motive power, and employed and controlled its agents and servants, was held liable for its infringement of a patent (Railroad Co. v. Winans, 17 How. 30, 15 L. Ed. 27), and where three individual partners in operating a coach line were held liable for the negligence of the driver of one (Bostwick v. Champion, 11 Wend. 571). But these and similar authorities have little tendency to support the theory that this depot company is a partnership, and that each of its stockholders is liable for all of its torts. It acquired its charter from the state of Minnesota. The requisite acts have been done under the statutes of that state to make it a corporation. Those statutes declare that, those acts having been performed, it is a corporation. It has issued and sold its stock. It has made its mortgage and it has transacted the business for which it was chartered for many years. The laws of Minnesota prescribe the duties and fix the liabilities of its stockholders. These are not the duties and liabilities of partners. The stockholders, it is true, have made contracts with the corporation; but there is nothing in those contracts which dissolves the corporation, impairs its existence, or changes the legal relation of the holders of its stock to the legal entity which issued it from that of stockholders to that of partners. There is nothing illegal or inequitable in the contracts. The law of the land fixes the liability of the parties to them, and that liability is not that of partners. The

fact that under these agreements the stockholders share the prosperity and adversity of their corporation has no tendency to prove that they are partners, because the stockholders of all corporations share the same fate. The deeds of these stockholders will not convey the property of the corporation. Their only control of it is by the vote of its stock, and by the contracts it makes, and it has every attribute of a corporate entity, while they have every attribute of stockholders. Neither it nor its employés are subject to the command or control of any of its stockholders, within the maxim respondeat superior, and neither it nor its servants are either the agents or the servants of the defendant, under the fellow servant law of the state of Minnesota.

The result is that there was no substantial evidence in support of the alleged cause of action in this case, and the court's instruction to the jury to return a verdict for the defendant was right. That judgment is accordingly affirmed.

CALDWELL, Circuit Judge, dissents.